# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of -- | ) | |
| | ) | |
| L.C. Gaskins Construction Co., Inc. | ) | ASBCA Nos. 58550, 59901, 59902 |
| | ) | |
| Under Contract No. N69450-09-C-5068 | ) | |

APPEARANCES FOR THE APPELLANT:

Dirk D. Haire, Esq.
Alexa Santora, Esq.
P. Sean Milani-nia, Esq.
  Fox Rothschild LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT:

Ronald J. Borro, Esq.
  Navy Chief Trial Attorney
Ellen M. Evans, Esq.
Stephen D. Tobin, Esq.
David M. Marquez, Esq.
  Senior Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE THRASHER

This appeal arises from L.C. Gaskins Construction Co., Inc.'s (Gaskins'), performance of a contract with the Naval Facilities Engineering Command (Navy or government) to provide structural repairs to Hangar 1552 at Mayport Naval Station, Florida. Gaskins subcontracted with an industrial coatings contractor, DACA, LLC (DACA), to perform a subset of the repair work requiring DACA to abrasively blast existing paint off of 34 hangar trusses, recoat the trusses with new paint, and dispose of the spent blast debris. Gaskins' seeks damages as well as excusable and compensatory time extensions resulting from alleged differing site conditions and changes caused by the government. In response, the government asserts affirmative defenses of fraud in performance and fraud in the inducement as well as asserting two affirmative claims: (1) assessment of liquidated damages resulting from alleged 32 calendar days of contractor delay, and; (2) damages resulting from alleged defective welding and deficient quality control. The Board conducted a nine-day hearing in Jacksonville, Florida. We only decide entitlement.

# FINDINGS OF FACT

## Project and Solicitation Requirements

1. Solicitation No. N69450-09-R-5068, dated 1 December 2008, requested proposals for Hangar 1552 structural repairs at Naval Station Mayport, Florida. Pertinent to these appeals, a subset of the repair work required the contractor to environmentally contain its work, abrasively blast existing paint off of the 34 hangar trusses, recoat the trusses with new paint, and dispose of the spent blast debris. (R4, tab 1 at 1-4)

2. Hangar 1552 is a rectangular building approximately eight-hundred (800) feet long, one-hundred and fifty (150) feet wide, and thirty (30) feet high. The building is primarily dedicated to maintenance and repair of helicopters but also includes two floors of office space. The hangar roof is supported by thirty-four (34) external steel trusses that extend approximately twenty (20) feet above the roof. (R4, tab 1 at 161; tr. 7/169-75) Each of the 34 trusses supports a structural load (tr. 7/174). Because the trusses extend above the roof, they were exposed to the elements and, in the time since Hangar 1552 was originally erected, had become severely corroded (R4, tab 1 at 161; tr. 7/175). At the time the RFP was issued, the trusses were so corroded that the structural integrity of the roof, and therefore the hangar, was in question (tr. 7/175-76).

3. The source selection was conducted as a negotiated procurement pursuant to FAR Part 15 and the solicitation was structured in six parts:

> Part 1, "Proposal Forms and Documents" containing the bid schedule, solicitation submittal requirements, and contract clauses (R4, tab 1 at 1-48);
>
> Part 2, "General Requirements" (*id.* at 51-155);
>
> Part 3, "Project Program" containing a "Project Description," "Project Objectives," "Site Analysis," and an extensive section entitled "Engineering Systems Requirements" (*id.* at 156-70);
>
> Part 4, "Performance Technical Specifications" (*id.* at 171-216);
>
> Part 5, "Prescriptive Technical Specifications" (R4, tab 3 at 465-93); and
>
> Part 6, "Attachments" which included "A-Drawings," "B-Reports," and "C-Contractor Data Required." At

2

"B-Reports" there are three reports: B.1, a Field Visual Inspection Report from URS Group, B.2, Environmental Testing by ENCO, and B.3, a Geotechnical Evaluation by Wolf Technologies, Inc. (R4, tab 1 at 218-451)

4. Part 1 of the solicitation incorporated the following pertinent clause:

5252.236-9312, DESIGN-BUILD CONTRACT – ORDER OF PRECEDENCE (AUGUST 2006)

(A) In the event of a conflict or inconsistency between any of the below described portions of the conformed contract, precedence shall be given in the following order:

(1) Any portions of the proposal or final design that exceed the requirements of the solicitation.
(a) Any portion of the proposal that exceeds the final design.
(b) Any portion of the final design that exceeds the proposal.
(c) Where portions within either the proposal or the final design conflict, the portion that most exceeds the requirements of the solicitation has precedence.

(2) The requirements of the solicitation, in descending order of precedence:
(a) Standard Form 1442, Price Schedule, and Davis Bacon Wage Rates.
(b) Part 1 – Contract Clauses.
(c) Part 2 – General Requirements.
(d) Part 3 – Project Program Requirements.
(e) Part 6 – Attachments (excluding Concept Drawings).
(f) Part 5 – Prescriptive Specifications exclusive of performance specifications.
(g) Part 4 – Performance Specifications exclusive of prescriptive specifications.
(h) Part 6 – Attachments (Concept Drawings).

3

(B) Government review or approval of any portion of the proposal or final design shall not relieve the contractor from responsibility for errors or omissions with respect thereto.

(R4, tab 1 at 40)

*Environmental Status of the Project*

5. In May 2008, approximately seven months prior to release of the solicitation, the government contracted with a third-party, a certified laboratory, to conduct two tests of the existing paint on the roof trusses: Totals testing and Toxicity Characteristic Leaching Procedure (TCLP) testing (app. 2nd supp. R4, tab 143). Totals testing provides the total metal content of the paint. TCLP testing is designed to determine the leachability of metals present in the paint. Essentially, TCLP testing is designed to determine the likelihood of metals leaching into a landfill, once the paint is disposed of as a waste. (Tr. 6/129-30)

6. Upon receiving the test results in May 2008, Ms. Patricia Kostic (an Environmental Site Manager working for Naval Station Mayport and the individual responsible for selecting the truss locations for testing) remarked "Chromium, Cadmium, and Lead is off the chart for worker protection but, good for Non-haz[ardous] disposal" (app. 2nd supp. R4, tab 143 at 223). Ms. Kostic then forwarded the results to her supervisor, Ms. Cheryl Mitchell (Naval Station Mayport's Environmental Director). Ms. Mitchell also remarked that the results were "[b]ad news for worker exposure but good news for waste disposal. You win some, you lose some." (App. 2nd supp. R4, tab 142 at 221)

7. The test results were released to the offerors as attachment B.2 of the solicitation which indicates lead, chromium and other metals in the paint. One report shows lead at 9200 "mg/kg wet" and chromium at 3300 "mg/kg wet." (R4, tab 1 at 345, 349) The report incorrectly identifies the samples as roof tiles but the chain of custody record correctly identifies them as having come from roof trusses and a schematic drawing shows the samples were taken from the trusses (*id*. at 358-59). Also included in attachment B.2 was an email from Ms. Mitchell, expressly advising offerors that:

> [T]he paint did not exceed TCLP levels for metal so it wasn't HW [Hazardous Waste] but the blast grit/paint chips are still a regulated waste that will require proper containerization & disposal through out [sic] HW facility so a line of accounting needs to be set-up & containers ord[er]ed in advance through

4

the facility. Gen'l guide specs section 01575 describe that process in detail.

(R4, tab 1 at 360)

8. On 24 December 2008, and after a pre-bid site visit, the government published Amendment No. 0001 in response to a bidder's question regarding whether the "structural steel [on the hangers was] lead based." Although there was testimony that paint is considered "lead based" if it contains *any* concentration of lead (regardless of amount), the response in solicitation Amendment No. 0001 provided that "[for] basis of bid assume that the paint is not lead based, but is still regulated waste. See Attachment B.2." (R4, tab 2 at 454, Q. 11; tr. 9/143)

9. On 7 January 2009, the government issued Amendment No. 0002 to the RFP adding a requirement that the coatings subcontractor be the Society for Protective Coatings [1] (SSPC) QP 2 Category A certified (a certification pertaining to a contractor's proficiency with hazardous coatings removal) (R4, tab 3 at 459, 463). Two days after publication of Amendment No. 0002, Gaskins submitted a Request for Information (RFI) to the contracting officer (CO) requesting clarification, stating,

> 3. The painting requirement for SSPC-QP 2 is a nationally recognized program that evaluates the capabilities of industrial paint contractors for their ability to safely remove and properly manage hazardous coat material in the field. According to the inspection and test reports there are no hazardous materials present. The blasting material is to be treated as a regulated material and not as a hazardous material. Possibly this requirement should be eliminated?
> 4. Amendment #2 added an additional requirement to the QP 2 saying that the SSPC QP 2 should also be Category A Certified. *This applies to lead paint removal. Are the inspection and test reports wrong in that there is lead paint on the project?* [Emphasis added]

(App. 2nd supp. R4, tab 147)

10. On 9 January 2009, Mr. Wittman (a member of the source selection board) sent an email to Ms. Mitchell posing Gaskins' questions:

> The second question I have is a result of an RFI we received from a bidder. The current bid documents indicate that the

---

[1] The Society for Protective Coatings was formerly the Steel Structures Painting Council.

Contractor should be certified per SSPC QP1 and SSPC QP2 Category A. The question from the bidder is whether or not SSPC QP2 Category A certification is really necessary for this project since we don't have a Hazardous Waste. I reviewed the SSPC QP2 document and it notes that it is primarily geared towards the removal of coatings containing lead and the Category A involves systems with engineered ventilation systems providing negative pressure. Can you give me any recommendations as to whether you believe this extensive of containment is required for this project given the testing done on the existing paint?

(App. 2nd supp. R4, tab 150 at 305)

11. Ms. Mitchell forwarded Mr. Wittman's email to Ms. Racine and Ms. Julie Kaiser. She stated that if the waste was going to be non-hazardous, and going to be a lot, she was inclined to allow the contractor to dispose of the waste off-base to avoid the "painful process" of having to order Defense Reutilization and Marketing Service (DRMO, later renamed to Defense Logistics Agency (DLA)) roll-off containers for transferring waste to the on-site temporary storage facility. Ms. Mitchell also remarked that off-site disposal had been permitted on prior projects and acknowledged that the General Guide specification section she referred to in her prior email was outdated, but that "Di" (Diane Racine, another Environmental Department employee) should be able to identify the replacement specification. (App. 2d supp. R4, tab 150 at 304)

12. Ms. Racine responded explaining that the Temporary Environmental Controls specification section:

> [O]utlines exactly what the contractor will need to do to make sure that the waste is disposed properly if it is hazardous waste, and the Abrasive Blasting paragraph refers the contractor back to Solid Waste Disposal if it is not hazardous waste. We shouldn't have to add anything to the RFP.

(App. 2nd supp. R4, tab 150 at 304)

13. Mr. Wittman forwarded these emails back to the CO, commenting that the government should have someone from the Environmental Department directly respond to Gaskins' questions (app. 2nd supp. R4, tab 152 at 342). Despite this suggestion, no response was provided to Gaskins' (tr. 1/71-72, 6/216-18).

6

*Disposal of Abrasive Blasting Debris*

14. Removal of the existing paint on the trusses would require abrasive blasting that would generate spent blast debris (spent debris). The spent debris consisted of a combination of the existing paint and abrasive material used to blast the existing paint off the trusses. There were two possible disposal sites for the spent debris, off-site at an approved landfill or on-site through Naval Station Mayport Hazardous Waste Storage Facility (Mayport HWSF or Part B Facility)[2]. The Naval Station possesses a Resource Conservation and Recovery Act (RCRA) permit, known as a "Subpart B" or "Part B" permit, which allows it to store hazardous waste for up to a year before final disposal at an approved Treatment, Storage, and Disposal Facility (TSDF) off-site (tr. 6/128, 140-41, 9/7). The permit requires that all hazardous waste generated on base be processed for disposal through the Mayport HWSF (tr. 9/14). The Mayport HWSF charges contractors the same commodity rate for disposal of hazardous waste and nonhazardous waste (tr. 8/147). By charging the contractor the same commodity rate regardless of the type of waste, however, the Navy assumes the price risk related to the disposal of hazardous waste (tr. 9/100).

15. Part 2 of the solicitation, General Requirements at Section 01 57 19.00 25, Temporary Environmental Controls, both defined and directed how blasting spent debris on this project would be categorized and disposed (R4, tab 1 at 133-51). The definition of "Solid Waste," found in paragraph 1.2.2, expressly excluded any hazardous waste or hazardous debris (*id.* at 133). "Debris" was defined at paragraph 1.2.3 in pertinent part as "Non-hazardous solid material generated during the construction, demolition, or renovation of a structure" (*id.* at 134). In contrast, "Hazardous Debris" was defined at paragraph 1.2.4 as "debris that contains hazardous waste per 40 CFR 261." Finally, "Regulated Waste" at paragraph 1.2.11, was defined – separately from Hazardous Waste – as "[t]hose solid waste that have specific additional Federal, state, or local controls for handling, storage, or disposal." (*Id.* at 134-35)

16. Part 2 of the solicitation, Section 01 57 19.00 25 also describes the Control and Disposal of Solid Wastes, Hazardous Wastes, Regulated Wastes and Abrasive Blasting (R4, tab 1 at 146, 148, 150-51). This part of the solicitation directs that hazardous waste be disposed of on-site through the Mayport HWSF. Paragraph 5.3.1, "Hazardous Waste/Debris Management" directs that all hazardous waste be disposed of through the Mayport HWSF (*id.* at 146). Likewise, a later provision of this same part of the solicitation, paragraph 3.7, "ABRASIVE BLASTING," pertains specifically to

---

[2] The Mayport HWSF is operated by the DLA at Naval Station Mayport. Naval Station Mayport is a large quantity generator of hazardous waste, as that term is defined by the Resource Conservation and Recovery Act (RCRA). (R4, tab 1, ¶ 1.9.1 at 139; 40 C.F.R. part 261)

requirements for abrasive blasting, directs that abrasive blasting debris will be disposed of per paragraph 3.7.2, "Disposal Requirements," which provides in pertinent part "Hazardous waste generated from blasting operations will be managed in accordance with paragraph entitled 'Hazardous Waste/Debris Management'" (¶ 3.5.1), which directs the contractor to dispose of all hazardous waste through the Mayport (HWSF) (*id.* at 151). However, this part of the solicitation is internally inconsistent regarding the disposal of the blast debris if it is not hazardous; it directs disposal of regulated waste on-site but directs non-hazardous waste to be disposed of off-site despite the fact the spent blast debris is both regulated and non-hazardous waste. Paragraph 3.5.1.5, "Disposal of Regulated Wastes," requires that, "[r]egulated wastes, except for asbestos and petroleum contaminated wastes, shall be disposed through Naval Station Mayport HWSF and **shall not be taken off Station by the Contractor**" (*id.* at 148). In contrast to disposal of regulated waste (¶ 3.5.1.5), paragraph 3.7.2 mandates disposal of non-hazardous abrasive blasting debris will be in accordance with the paragraph entitled, "CONTROL AND DISPOSAL OF SOLID WASTES" (¶ 3.4) which directs the contractor to take such waste off-site (*id.* at 146).

17. Part 3 of the RFP, under Project Description, also specially addressed the disposal of the blast debris (at § F2020 1.1.) that would necessarily be created by preparing the trusses for new paint stating it would "be treated as regulated waste and containerized for disposal through the Naval Station Mayport hazardous waste storage facility (HWSF)" (R4, tab 1 at 159). Likewise, section B201009, "EXTERIOR PAINTING AND COATINGS," specified that "blast grit and paint chips" would be treated as regulated waste in accordance with the RFP section entitled "Paint Related Work" which states the paint is not considered hazardous waste but "the blast grit/paint chips are a regulated waste that will require proper containerization and disposal through the Naval Station Hazardous Waste Storage Facility (HWSF)" (*id.* at 164-65, 170).

18. Amendment No. 0002 to the RFP also added, Part 5, Prescriptive Technical Specifications, Section 09 97 13. 27 (Exterior Coating of Steel Structures) (R4, tab 3 at 464). Subparagraph 3.6.6, Disposal of Used Abrasive, directed the coating contractor to "[d]ispose of used abrasive off Government property in accordance with Federal, State, and Local mandated regulations" (*id.* at 482).

*Gaskins' Proposal*

19. Gaskins' initial proposal, submitted on 15 January 2009, provided in pertinent part the following statement describing how it intended to prepare the surface of the trusses and dispose of the particles, blast grit, and debris resulting from the surface preparation – "[s]urface preparation and the removal of existing paint requires that the truss be shrouded during the preparation phase and that all particles, blast grit and debris be treated as regulated waste and containerized for disposal through the Naval Station Mayport hazardous waste storage facility" (R4, tab 5 at 589). This language remained

8

the same through each of Gaskins' revised proposals and its Best and Final Offer (BAFO) (*id.*). The proposals were evaluated by a Source Selection Board (SSB) that consisted of three voting members: Angela Hocutt, Adam Hocutt, and Kurt Wittman (tr. 6/219, 7/204-05, 8/165). All three members of the SSB testified at trial that they understood the statement in Gaskins' proposal about disposing of blast debris through the Mayport HWSF to mean Gaskins would dispose of the blast debris through the Mayport HWSF, and that they relied on that statement in recommending award to Gaskins (tr. 6/210, 7/214-16, 8/166-67).

20. Mr. Frost (Gaskins) testified that he supervised Mr. Malcom Beasley, the proposal estimator, and reviewed Gaskins' proposal before it was submitted (tr. 1/61). Gaskins' subcontracted with DACA for the blasting and painting scope of the work and relied upon DACA for that part of their proposal (tr. 1/72-73). Based upon DACA's inputs, the proposal for the blasting and painting scope of the job was based upon the understanding that this was a no lead job (tr. 1/61, 71-72, 2/77, 5/245). Gaskins' final bid incorporated DACA's bid submittal to Gaskins for the blasting and coatings scope of work (tr. 1/72-73, 103-04). Because Amendment No. 0001 told offerors to bid the job as involving no lead-based paint, Gaskins and DACA did not include any costs of handling or disposing of lead-based paint in its bid. Instead, Gaskins and DACA assumed that – if lead-based paint was discovered – the government would provide additional compensation. (Tr. 5/51) DACA bid the blasting and coatings work at a total cost of $424,891.00, using nine workers, and anticipated a start date of 15 August 2009, and a finish date of 20 December 2009 (app. 2nd supp. R4, tab 288; tr. 3/75-77). The proposal and all revisions were signed by Mr. Gaskins (R4, tab 5 at 501).

21. Regarding disposal of the spent debris, DACA based its proposal on solicitation Amendment No. 0002, § 09 07 13.27, Part 3.6.6, i.e., that the spent debris would be disposed of off-site (app. 2nd supp. R4, tab 128). Mr. Mike Mingle, who prepared and submitted DACA's bid to Gaskins, testified that he read the entire RFP and calculated DACA's price for disposing of the spent debris off-site disposal. However, he did not remember ever communicating this to Gaskins. (Tr. 5/230, 277) The bid submitted to Gaskins does not describe the method of disposing of the spent debris (app. 2nd supp. R4, tab 270). Mr. Frost testified it was his understanding that the section proposing to dispose of all spent debris on-site was the result of a "cut and paste" error by the architect-engineering firm (A&E) hired by Gaskins (tr. 5/75). Neither Mr. Gaskins nor Mr. Beasley, who prepared the proposal, testified at the hearing.

22. Gaskins was awarded Contract No. N69450-09-C-5068 on 12 March 2009 (R4, tab 8 at 627-28). The contract completion date (CCD) was 26 June 2009 for contract line item number (CLIN) 0001 and 7 May 2010 for CLINs 0002, 0003, and 0004 (*id.* at 631). Additionally, the contract incorporated Gaskins' technical proposal as part of the contract documents (*id.* at 664). Thereafter, on 16 April 2009, Gaskins entered

into a subcontract with DACA to perform the paint removal and recoating requirements of the contract (app. supp. R4, tab 101 at 895).

*Surface Preparation and Coating Plans, Blasting and Coating Plans and Vacuum Plans*

23. Gaskins was contractually required to submit and obtain approval of various site specific environmental plans prior to commencing work. Pertinent to this appeal, Gaskins (DACA) submitted various versions of a Site Specific Workplan for Surface Preparation and Coating Application (Surface Preparation and Coating Plan), Site Specific Environmental Plan for Blasting and Coating Activities (Blasting and Coating Plan), and a Site Specific Vacuum Plan for Vacuuming Spent Blast Media Activities (Vacuum Plan) for government review. Government witnesses who were involved in the review process testified that the submittal process began in the fall of 2009 and described the submittal process as "piecemeal," and that DACA repeatedly altered its plans and did not adhere to the submittal review process (tr. 8/12-13). One witness testified the submittal process was "chaotic" as a result the government had trouble tracking Gaskins' submittals because they were often incomplete (tr. 7/234, 236-37). A review of the record supports these witnesses' testimony and also confirms the government could not, or did not, control the process.

24. Pertinent to this appeal, the Surface Preparation and Coating Plan specifically addressed where the spent blasting debris would be sent for disposal. Gaskins submitted DACA's initial Surface Preparation and Coating Plan on 15 December 2009 but this initial draft plan did not specify the disposal location of abrasive blast media or waste disposal (R4, tabs 78, 79 at 71, ¶ 10.3.1, at 82, ¶ 20.2). The CO informed Gaskins on 21 December 2009 that the plan was rejected and provided specific comments dated 17 December 2009 (R4, tab 80 at 1, 3-4). Comment No. 1, regarding section 10.3.1, stated in pertinent part, "disposal is to be through the Mayport Part B Facility in accordance with (iaw) SOPA(ADMIN)MYPTINST 5090.1SERIES" *(id.* at 3). Comment No. 2 similarly stated: "all **industrial process waste and hazardous waste is to remain on-Base and be disposed through the Mayport Part B Facility**" *(id.* at 4). Subsequently, on 11 January 2010, Gaskins revised a draft Surface Preparation and Coatings Plan stating the spent abrasive would be disposed of at the Mayport Part B facility (R4, tab 350(g) at 32 of 33, ¶ 20.3).

25. Thereafter, in late January 2010, DACA began taking the position that the spent debris could be taken off base to a landfill. Mr. Mingle, DACA's regional manager, met with government personnel including, Ms. Joann Mason, Ms. Julie Kaiser (Moleski)[3] and Mr. David Moody, at NAVFAC's environmental office to discuss disposal of abrasive blast waste (tr. 8/46-48).

---

[3] Ms. Julie Kaiser's last name by the time of the hearing was Moleski. Since her name was Kaiser during the contract, this decision will use the name Kaiser.

26. Mr. Mingle (DACA) was of the opinion the waste could be disposed of off-base based upon his reading of the specification added by Amendment No. 0002 to the RFP, which, ¶ 3.6.6 Disposal of Used Abrasive, states "[d]ispose of used abrasive off Government property in accordance with Federal, State, and Local mandated regulations" (tr. 8/46-47, 50-51). On 26 January 2010, Mr. Mingle forwarded a letter to Gaskins' project manager, in which he referred to "our meeting on Monday, January 25 at the job site regarding hazardous waste disposal" and stated, "[t]he owner [Navy] agrees with the position of DACA, Inc., that any hazardous waste will be disposed of off-site by DACA consistent with Amendment 2, Section 09 97 13.27, Part 3.6.6. This is the specification to which DACA bid the project." (App. 2nd supp. R4, tab 128) That same day, DACA (Mr. Mingle/David Ogletree) sent a change order request form to Gaskins asserting that the change in disposal methods from what was specified in paragraph 3.6.6 of Amendment No. 0002 of the solicitation would amount to a $528,803 impact on DACA. The description of the change referred to "comments dated 12/17/2009 [presumably the government's comments on DACA's Surface Preparation and Coating Plan] all waste to be disposed of on-site at the Part B facility." (R4, tab 90)

27. The record is devoid of evidence corroborating Mr. Mingle's account of the meeting or that the CO was aware of the meeting or approved Mr. Mingle's position. Contrary to Mr. Mingle's recollections, Ms. Mason testified that she and Ms. Kaiser told Mr. Mingle during the meeting that they understood the contract to require disposal of abrasive blasting waste through the Mayport HWSF (tr. 8/48-49). Mr. Mingle could not remember ever receiving any written confirmation of his position from the government (tr. 5/268). Mr. Anderson (Gaskins) testified he never attended any meeting where a government employee told Gaskins or DACA it was acceptable to dispose of spent debris at an off-site facility (tr. 5/200-02). Likewise, the CO testified she could not recall attending any meeting in January 2010 with Mr. Mingle or Mr. Anderson, had never seen Mr. Mingle's letter to Gaskins, and never approved any off-site disposal of waste (tr. 7/22-23).

28. Gaskins submitted a revised draft Surface Preparation and Coating Application Plan on 1 February 2010 that stated spent abrasive debris would be "hauled to a landfill for disposal" (R4, tab 350(h) at 32-33 of 33, ¶ 20.3). This plan was followed by another draft on 23 November 2010 which also specified disposal at a landfill but for the first time specified a specific landfill, the Chesser Island Road Landfill in Folkston, Georgia (R4, 350(n) at 26 of 26 ¶ 19.2.1). The government provided comments, on Gaskins "Revised CWP & ABP for Hangar 1552" on 1 February 2011 stating:

11

| Page 26 of 26, Section 19.2.1, Waste Management and Disposal | Plan states: "The spent abrasive will then be characterized, manifested, and transported to Chesser Island Road Landfill in Folkston, GA..." |
| --- | --- |
| | **All spent blast media regardless of characterization (i.e. hazardous and/or non-hazardous) is to be disposed through the Mayport HWSF. NO blast media is to be disposed at the Chesser Island Road Landfill in Folkston, GA..."** |

(R4, tab 350(a) at 22)

29. Despite the plans submitted the same month, on 9 February 2010, that specified disposal at a landfill off-site, DACA (Mr. Mingle) submitted a Blasting and Coating Plan which stated both hazardous waste and regulated waste were to be "managed" by the Mayport HWSF (R4, tab 95 at 3, 8). On 10 February 2010, Brian Price (NAVFAC SE) emailed Gaskins, copying the CO, Ms. Bushey, "[i]n an effort to move forward, the Blasting and Coating Plan is approved, w/ comments. Since it appears the comments require pages to be inserted into our copies, please email those pages to us." (App. 2nd supp. R4, tab 157 at 1, tab 158 at 1) The forwarding email referenced "Site Plan Submittal #4." Comments are included at that Rule 4 tab but they do not mention disposal or reference which revision the comments are associated with. Additionally, the draft plan is not included in the file with the comments. (*Id.*) Consequently, it is impossible to tell whether this copy of the plan was ever approved.

30. The record includes an 11 March 2010 email forwarding revision 6 of DACA's site specific workplan to the government (app. 2nd supp. R4, tab 159 at 374). A copy of a site specific workplan is included in the record behind the email purporting to be the attachment. This plan specifies disposal off-site. (*Id.* at 406, ¶ 20.3) However, this plan is dated some seven months later (22 October 2010) than the email (11 March 2010) and does not identify a revision number (*id.* at 375). Again, it is impossible to tell whether this plan was approved.

31. On 30 March 2010, Gaskins forwarded DACA's Revised Vacuum Plan to the CO (app. 2nd supp. R4, tab 277). DACA's approved Vacuum Plan does not specifically address disposing of waste off-base. The Vacuum Plan included an email from Mr. Price to Mr. Ryals (DACA), on 4 June 2010, stating: "Your Vacuum Plan is approved w/ one comment" which related to labeling the containers to be disposed (*id.* at 1119). The Vacuum Plan includes a map of the base labeled "HAUL ROUTE" indicating a route from the work site to the "CONTRACTOR'S GATE" (*id.* at 1121).

32. The Vacuum Plan submittal also included a revised Blasting and Coating Plan and a Surface Preparation and Coating Application Plan, which were specifically revised to indicate disposal off-base (app. 2nd supp. R4, tab 277 at 1126, 3708). DACA included

a cover page to the included Surface Preparation and Coating Application Plan that states that one revision has been made to the plan "paragraph 20.3" (*id.* at 1126). Paragraph 20.3 states in pertinent part, "[t]he spent abrasive will then be characterized, manifested and hauled to Chesser Island Road Landfill in Folkston, GA by EnviroVac Industrial & Environmental Services for disposal" (*id.* at 1158). Likewise, DACA made one revision to the Blasting and Coating Plan adding a paragraph to the section addressing "Hazardous Waste Prohibition" stating in pertinent part, "Once the spent blast media is tested and passed it will be profiled, manifested and hauled to Chesser Island Road Landfill in Folkston GA by EnviroVac Industrial & Environmental Services" (*id.* at 1161, 1167). Perhaps consistent with disposal off-base, the plan also includes an attachment of a map with a designated "HAUL ROUTE" (*id.* at 1171). However, the section on "Disposal Documentation for Hazardous and Regulated Waste," as in the original submittal, states "not applicable because it will be managed by NS Mayport's HWSF" (*id.* at 1164). We find it is impossible to determine from the record whether the government ever approved the specific revisions to these plans.

33. We find that most of the plans in the record lack a date or fail to indicate whether they are revised submittals. It is almost impossible to correlate government comments with specific submitted plans. This problem is compounded by the fact that most submittals and government approvals and comments were forwarded by emails with attachments. Most attachments are not included in the record, only the forwarding email. This results in making it impossible to correlate government comments/approvals with a specific submittal. In those few instances where we can correlate the comments with a specific plan, the government consistently required on-site disposal.

*Steel Profile Issue: Additional Layer of Intermediate Paint/Modification No. (Mod.) P00003*

34. Shortly after starting its work in March 2010, DACA discovered that the existing profiles of the trusses were deeper than indicated by the Specifications (R4, tab 105). The contract specified a coating thickness to be achieved after the application of all coating layers. The test blasting indicated the standard three-coat system specified by the solicitation and adopted by the Designer of Record would not achieve the required thickness. (Tr. 8/149-150) The CO suspended work on 31 March 2010 and by 26 May 2010, both the government and Gaskins agreed to resolve the steel profile issue by the application of an additional intermediate layer of paint (R4, tab 115 at 2; tr. 8/150-51).

35. On 16 June 2010, the government internally agreed that Gaskins' proposal, requesting $508,979 and assuming a 5 July 2010, re-start date, was "fair and reasonable." (app. 2nd supp. R4, tab 173; R4, tab 118). On 3 August 2010, the government issued Gaskins a notice to proceed and stated a modification was forthcoming. The email explained the government agreed with Gaskins' and DACA's costs for the new work and application of the intermediate coating application ($249,175) but not the time and cost regarding the associated delay. As a result, the modification would include an extension

13

of 34 working days to apply the additional layer of intermediate paint (thereby extending the contract completion date by 53 calendar days from 30 July 2010 to 20 September 2010) until the delay and associated costs could be negotiated. (R4, tab 130)

36. Unilateral Mod. P00003 was issued on 30 September 2010 increasing the price by $466,988.36 and adding 159 calendar days to the schedule (R4, tab 11). This amount was less than Gaskins' proposal of $508,979, which assumed that the notice to proceed would be issued a month earlier than it was (app. 2nd supp. R4, tab 173; R4, tab 118 at 1).

37. The combination of new work and delay days added to the contract also extended the contract completion period over a second Christmas holiday not anticipated by the original schedule or the solicitation (R4, tab 11; app. 2nd supp. R4, tab 252). However, Mod. P00003 counts the holiday period as part of the time in which Gaskins would be permitted to perform the additional work (tr. 7/69).

*Perry Roofing*

38. During the performance of CLIN 0001 in 2009, Gaskins' roofing subcontractor, Perry Roofing, made dozens of penetrations in the hangar roof to facilitate installation of temporary shoring (tr. 8/41-42). Mr. Richard Erdman, Perry Roofing's senior field superintendent, testified Perry Roofing's original plan was to start work in the fall of 2009 and complete its work in May 2010 (tr. 3/56-57). Instead, Perry Roofing could perform only minor work prior to November 2010 and lower roof work (constituting approximately 20% of its scope) between November 2010 and July 2011 (tr. 3/59-60). Perry Roofing did not complete its scope until January 2012 (tr. 3/64). The start-and-stop periods resulted in Perry Roofing incurring greater administrative costs than it could foresee prior to execution of its subcontract (tr. 3/60-61). Mr. Erdman also testified that although the government allotted Perry Roofing a small staging area – which permitted Perry Roofing to purchase, store, and invoice for 20% of the required materials – Perry was nonetheless unable to purchase, store, or invoice for the remaining 80% of required materials until a later point in time, after expiration of its purchasing window and during a time of increased materials costs (tr. 1/60-64; app. 2nd supp. R4, tab 309). Contradicting Mr. Erdman's testimony, Ms. Mason testified that Perry asked permission to store roofing materials at the project site in February 2011, which was granted and the government paid for the materials to be stored. The materials constituted 80% of the materials required for the roof and were paid for during February 2011. (Tr. 8/42-46) The vendor notices related to Mr. Erdman's reference to increased material costs were not effective until 1 March 2011 (app. 2nd supp. R4, tab 309).

14

*Discovery of Defective Welds on the Trusses*

39. CLIN 0002 of the contract required Gaskins to repair external structural trusses involving welding certain truss members to strengthen old welds that were failing (R4, tab 1 at 3). Under the contract, Gaskins was responsible for inspecting and testing the welding work for quality control (R4, tab 352 at 52, ¶ 3.2). Per the contract, Gaskins chose to contract with a third-party, certified weld inspector (CWI), Ellis & Associates, Inc. (Ellis), to verify that the newly installed welds met contract requirements.

40. On 12 April 2010, Mr. Brian Thomas, an independent "NACE"[4] (coatings) inspector hired by DACA, forwarded DACA (Mr. Page Wright) a summary of his observations that some welds on the trusses appeared to be defective (R4, tab 108 at 3-4). Mr. Wright documented Mr. Thomas' observations in two reports which he forwarded to DACA and Gaskins the following day (R4, tab 110 at 1; tr. 2/247-48). Mr. Wright testified that Gaskins verbally responded advising him that no corrective action would be taken because the government had already "bought off" on the welds. He documented this conversation in a Work Condition Report and then forwarded it to DACA's corporate office. (R4, tab 109; tr. 2/251-52)

41. Neither Gaskins nor DACA notified the government about Mr. Thomas' concerns regarding the defective welds (tr. 7/9, 8/29). Additionally, the government's ability to independently discover the defects in the welds was hindered because Gaskins' CWI, Ellis, had previously submitted reports to the government approving the same welds and in early 2010 the government implemented a safety "stand down," unrelated to the welding, prohibiting NAVFAC SE employees from climbing scaffolding (where they might have detected the defective welds) until they had undergone retraining in fall protection (tr. 8/29-30).

42. The government only learned of Mr. Thomas' concerns a month or two later when Ms. Mason discovered Mr. Wright's reports among documents Gaskins submitted to the government in support of a request for additional time relating to the steel profile issue (tr. 7/8, 8/28-30, 154-55). Upon examining the reports, Ms. Mason inspected the trusses, identified defective welds and prepared a report for the CO reflecting her findings (R4, tab 121; tr. 8/32).

43. On 29 June 2010, the CO notified Gaskins' president, Mr. Larry Gaskins, of the defective welds and demanded the removal of the Gaskins employee who was

---

[4] The National Association of Corrosion Engineers (NACE) International is an organization that sets standards for inspection in the protective coating industry and provides certification programs in various areas, including a coating certification program.

functioning as its quality control manager at the time[5] (R4, tab 124). Gaskins responded by disputing that any welds were defective, but proposed to have Ellis appoint an independent certified welding inspector. Ellis identified Mr. John Champion, who in 2009 had previously inspected unrelated welds on the project.[6] (R4, tab 125) Mr. Champion testified that when he arrived to investigate the concerns raised by the government, he was instructed by Gaskins to inspect the truss apexes, which he had not previously inspected (i.e. the new welds performed by Garrison Steel, Gaskins' steel subcontractor) (tr. 7/130-32). Gaskins did not offer any evidence to refute Mr. Champion's testimony that he was told to inspect only welding performed by Garrison Steel.

44. Mr. Champion found that on each of the 34 truss apexes there were one or more welds that did not comply with the weld acceptance criteria published by the American Welding Society (AWS). Defects he observed included, but were not limited to, rolls, cracks, and undercut and undersized welds. (Tr. 7/107) He testified that each one of these types of defects, as well as others, could result in failure of the affected welds (tr. 7/109). He documented his findings in reports and contemporaneous photographs that he provided to both Ellis and Gaskins (R4, tab 352 at 97-190 (reports), tab 355(b) (photographs); tr. 7/94-95). During his testimony, Mr. Champion described at length the defective welds depicted in several of his photographs, generally characterizing the welds as "extremely bad" (tr. 7/164-65). Mr. Champion also testified that no one at Gaskins ever expressed any disagreement to him about the conclusions in his reports (tr. 7/148).

45. Michael Herring, a NAVFAC senior structural engineer with 36 years of experience, who was qualified as an expert in structural engineering, testified at trial that the defects observed by Mr. Champion were located on structural welds, i.e. welds designed to support a structural load (tr. 7/179). Mr. Herring expressly refuted earlier testimony of Harry Frost and Tim Anderson, of Gaskins, that the defective welds were "non-structural" and that rework was only necessary to ensure the quality of the coating application (tr. 7/198-99 (Herring), 1/200-01 (Frost)). Mr. Herring also testified that if the defects documented by Mr. Champion had not been discovered and corrected, the welds could have failed, resulting in a "major catastrophe" by causing the roof to collapse on people and equipment inside the building (tr. 7/202). We find Mr. Herring's testimony more credible than that of Mr. Frost and Mr. Anderson.

---

[5] The removal demand was issued per the "Materials and Workmanship" clause, 52.236-5(c) (R4, tab 124 at 3).

[6] The government initially hired its own welding inspector but after a short period of concurrent inspections developed sufficient confidence in Mr. Champion to move forward solely with him (tr. 8/156).

16

46. On 12 October 2010, DACA provided Gaskins the analytical results for the first group of spent blast debris. Gaskins provided the same to the government on 13 October 2010. (App. 2nd supp. R4, tab 92) Ms. Kaiser (the Mayport hazardous waste program manager), confirmed that the results were "[n]on-haz, but the '2nd Analysis of spent abrasive Truss 2' has HIGH chromium (4.0 mg/L and 5.0 mg/L is HW). I need to verify with Cheryl [Mitchell] that she is ok sending off base." (App. 2nd supp. R4, tab 185) On 14 October 2010, Ms. Kaiser sent an email to Ms. Mitchell asking the following question in the subject line: "Do you have a problem with 4.0mg/L TCLP Chromium Black Beauty blast grit going off as NONHAZ???" (app. 2nd supp. R4, tab 188). That same day at 11:06 AM, Ms. Kaiser sent the following message to Mr. Brian Price (the CO's representative) and Ms. Joann Mason (the CO's engineering technician):

> Spoke with Cheryl regarding the analysis. Additional information from the contractor is required for a decision on disposal.
>
> 1- Where does the contractor intend to dispose the blast media?
> 1A- Chester Island road landfill, Permit #024-006D PO Box 128 Folkston Ga. 31537
>
> 2- Will the contractor be completing a waste profile at the disposal facility for Env. review and signature)?
> 2A- Yes, once the blast media is delivered to landfill, a manifest stating the amount. A waste profile will then be sent to you and Joann Mason for review.
>
> 3- How many tons of blast grit were generated for trusses 4-6?
> 3A- Approx 10-12 tons. This is for trusses 4 and half of truss 5.
>
> 4- Has the contractor already blasted trusses 1-3? If yes, where did this blast grit go for disposal?
> 4A- In truss group #1 only truss #1 and the apex's on trusses #2 &#3 have been blasted. No disposal at this time.
>
> 5- Did the contract specify disposal through the Mayport HWSF?
> 5A- This has not been determined Hazardous material Per the TCLP (see attached results)

> Unfortunately, I will be on leave from tomorrow through next
> Tuesday (returning 10/20/10). If you can get this information
> to me today, I will try to have an answer before I leave.
> Thanks, Julie

(App. 2nd supp. R4, tab 186 at 464-65) Ms. Kaiser then forwarded this entire exchange to Mr. David Moody (a Gaskins Superintendent) at 1:24 PM (*id.* at 464).

47. Separately at 1:14 PM, Ms. Mason emailed Ms. Kaiser the following answer to her questions:

> Item # 1 - landfill Folkston Georgia
> Item # 2 - assume is required.
> Item # 3 - Contractor does not know the weight at this time,
> will provide upon delivery to the landfill/or estimated until
> turned in.
> Item # 4 - response is the contractor has not blasted trusses
> 1-3, with exception of the trusses for the welding
> inspection/corrections.
> Item # 5 - Media is allowed to be disposed off-site if it is
> non-hazardous.

(App. 2nd supp. R4, tab 190 at 490)

48. Ms. Mitchell testified that waste disposal requires a waste manifest to maintain a chain of custody throughout the disposal process. This document provides the government with notice of the circumstances of the disposal and an opportunity to approve or disapprove the disposal. Normally, at Mayport, this document would be filled out and signed by an employee in the environmental office. (Tr. 6/151-52) However, these procedures were not followed in this case. Without notice of approval from the government, Envirovac (under contract to DACA) disposed of the first batch (two containers) of spent blast debris off-site at the Chesser Island Landfill on 18 October 2010 (R4, tab 155). Mr. Wright (DACA) improperly signed the manifests in lieu of the environmental office. The manifest and the associated documents also misidentified the waste generator as DACA, rather than Mayport, identified the point of contact as the contractor (rather than a government employee required by the contract) and misidentified the waste as "sandblast media" (tr. 9/38-40). The government did not learn of the disposal until later on 22 October 2010 when Gaskins emailed the disposal tickets to the environmental office (app. 2nd supp. R4, tabs 197-98).

49. At 1:02 PM on 20 October 2010, after returning from leave, Ms. Kaiser provided the following response, directly to Gaskins: "I am good with Che[ss]er Island

Road Landfill (note the spelling)....With respect to question 5. I need to read the language in your contract. While the waste is technically non-hazardous, it came close to HW levels for chromium." (App. 2nd supp. R4, tab 192 at 495) At 2:44 PM that same day, Ms. Mason responded – with a "cc" to the CO, Ms. Angela Hocutt,[7] stating "Team, Please see the enclosed amendment 0002 page that specifically allows for off-site disposal." Attached to Ms. Mason's email was paragraph 3.6.6 of the "Exterior Coating of Steel Structures" specification section, as added to the RFP as part of Amendment 0002. (App. 2nd supp. R4, tab 195 at 521)

50. Two minutes after receiving Ms. Mason's email attaching paragraph 3.6.6, Ms. Kaiser provided, "Joann, Thanks, that was what I needed. Please be aware that the chromium level is high, but is below the HW limit for chromium. However, Chesser Island Road Landfill does have the right to reject acceptance of the waste (I don't think they will, but it is conceivable)." (App. 2nd supp. R4, tab 192 at 495)

51. Ms. Hocutt testified that Ms. Mason did not have authority to change the terms of the contract. Ms. Hocutt's testimony establishes that she read the email and disagreed with Ms. Kaiser and Ms. Mason's representations that the contract allowed disposal off-site but did not take any action to correct the statements made to the contractor. Her explanation for remaining silent was that at the time she did not think she had an action because she expected the contractor to request a variance to the contract. She also understood the email was directed to Gaskins as well as the government personnel. (Tr. 7/47-50)

52. On 3 December 2010, DACA received the testing results for the next group of spent blast debris, which Gaskins forwarded to the government on 6 December 2010. The government characterized the results as Hazardous Waste, based on the chromium value of 9.6 mg/L (almost twice the Hazardous Waste threshold of 5.0 mg/L). Upon receiving the results, Ms. Kaiser found both the results and the sampling techniques used by DACA and its third-party laboratory to be valid. (App. 2nd supp. R4, tab 202)

53. On 14 December 2010, Gaskins sent a follow-up letter to the government requesting direction for how to proceed in light of the chromium discovery (R4, tab 194). On 17 December 2010, the CO responded by email to Gaskins' 14 December letter that the contract required Gaskins to dispose of "all particles, blast grit chips, and debris" through the Mayport HWSF. In addition, the CO directed that that no additional blasting could be performed until DACA submitted another site specific sampling plan to replace its previously approved, stating, "It has also come to our attention that the required waste determination has not been properly performed. Per Part 2, Section 07 57 19.00 25, Paragraph 1.5 LABORATORY ANALYSIS." (R4, tab 19)

---

[7] Ms. Hocutt's name at the time of the email was Angela Bushey.

54. On 7 January 2011, Gaskins and the CO participated in a discussion concerning the discovery of hazardous waste (R4, tab 203). In an email sent directly to Gaskins' personnel and summarizing the meeting, the CO provided that she:

> Reiterated email of December 17th stating that Part 3 and [the] contractor's technical proposal indicated spent media would be disposed of as regulated waste through Part B so that portion of the effort was not considered a change. However, is [sic] material did re-test as hazardous using new approved sample plan and having representative results, the difference in the containment and PPE required would be a change provided that it wasn't the virgin media causing the hazardous material results.

(R4, tab 203 at 32175) Also in an email dated 7 January 2011, Ms. Mason confirmed that DACA re-tested the virgin media (i.e., the abrasive material without any addition of existing paint) and the virgin media results were non-hazardous (*id.* at 58144).

55. Gaskins responded by letter on 19 January 2011 questioning the CO's direction and informed the CO it had already disposed of two containers of spent blast media off-site (R4, tab 20 at 720-21).

56. On 24 January 2011, the CO authorized the blasting efforts to proceed, based upon the fact DACA's revised Site Specific Abrasive Sampling Plan was in the government review process (app. 2nd supp. R4, tab 214).

57. The CO responded to Gaskins' 19 January 2011 letter on 27 January 2011 and again directed Gaskins to dispose of spent blast media at Mayport's HWSF (R4, tab 22). Mr. Joiner (DACA) testified that the on-site rates, during DACA's performance, exceeded what DACA paid for Envirovac to directly dispose of the waste at an off-site landfill (tr. 3/95-96).

58. On 2 February 2011, Gaskins notified the CO that Gaskins had taken six additional samples that when tested indicated "extremely high levels of chromium." The letter continued stating:

> The RFP indicated that chromium levels in the existing coatings were below the action level....[T]he attached test results conflict with the RFP, therefore...please consider this as notice of a differing site condition....
>
> Additionally, since Paragraph (a) of FAR Clause 52.236-2 requires that we notify you 'before the conditions are

disturbed,' we will suspend all surface preparation activities until we receive direction from you on how to proceed.

(R4, tab 24)

59. On 17 February 2011, the CO responded to Gaskins' 2 February 2011 notice of a differing site condition explaining that, regardless of the TCLP test results, the solicitation required that all paint removal debris, whether hazardous or regulated, be treated as regulated waste and disposed of at Mayport's HWSF, which would be the same cost under either circumstance (R4, tab 26).

60. Gaskins submitted four claims between 11 March and 3 May 2011 (R4, tabs 25, 30, 33, 34). On 9 November 2011, Gaskins submitted a consolidated claim, on behalf of itself and its subcontractors, seeking $6,225,235.82 resulting from the discovery of hazardous materials, as well as other impacts (R4, tab 36 at 1111, 1121). On 2 January 2012, the government acknowledged receipt of Gaskins' claim and provided notice the CO would issue a contracting officer's final decision (COFD) by 30 June 2012 (app. supp. R4, ex. 3). The CO did not issue a COFD by 30 June 2012 and Gaskins appealed the CO's deemed denial to the Board on 11 February 2013. We docketed their appeal as ASBCA No. 58550.

*Worker Protection/Personal Protective Equipment (PPE) & Environmental Containment*

61. Mr. Mingle (DACA) testified regarding the impact the discovery of high levels of chromium in the spent blast debris had on DACA. He testified that DACA was required to dispose of its previously approved personal protective equipment (PPE) as a Hazardous Waste, due to the hazardous, abrasive debris residue contaminating the PPE. Because the PPE was now classified as a Hazardous Waste, DACA could not reuse the PPE, as it had originally planned to do. Instead, DACA was required to continually dispose of the PPE at Mayport's on-site hazardous waste storage facility, at a cost, and purchase new PPE. (Tr. 5/258-59) Mr. Frost (Gaskins) testified that the delay from December 17th through January 24th caused by the CO's directive that DACA submit another sampling plan to replace its previously approved sampling plan, and the inefficiency of using the DLA-provided roll-off containers, required DACA to increase its workforce from the as-bid 9 workers to – at times – up to 20 workers, in an attempt to keep up. Each of these new workers needed to be outfitted with PPE. (Tr. 3/97-99) Mr. Hames (DACA) testified that DACA erected a second containment for its workers to remove the PPE (outside of the primary containment) because the dust from workers' PPE could not be released beyond the containment and, as a result, workers were not permitted to remove their PPE within the containment (tr. 2/127).

62. Mr. Mitchell Blum provided an expert report, a supplemental report incorporating testimony provided at the hearing, and testified during the hearing as a

21

government expert witness qualified in Construction Health and Safety and Hazardous Material Management (R4, tabs 41(a), 41(b); tr. 9/125-52). His report specifically addressed alleged changes in required level of containment and worker protection resulting from the discovery of elevated levels of chromium in the spent abrasive waste (R4, tab 41(b) at GOV4-12, ¶¶ 2.1, 4.0). His overall conclusion was that the discovery of elevated levels of chromium in the spent debris did not change the required level of worker protection or containment.

*Worker Protection*

63. Mr. Blum opined that, contrary to Gaskins and DACA's claims and testimony, the level of worker protection is not determined by the level of hazardous waste found in the spent abrasive waste or by the tests (the TCLP test results) included in the solicitation regarding the level of heavy metals in the paint. The level of worker protection for this project was controlled by OSHA regulations and the USACE in EM 385-1-1. Those regulations do not set any minimum levels for metals in paint at which a project meets any criteria as a "lead" or other metals "project." Instead, the level of worker protection is determined by the level of exposure indicated by exposure monitoring during performance. (R4, tab 1 at 93-94, tab 41(b) at GOV9)

64. Internal DACA emails establish that DACA understood this in February 2011. On 6 February 2011, Mr. Gram asked Mr. Morgan, "What you set up with the CIH was based on the original two TCLP readings. Now that we have 5 of 6 with Chromium and such high levels, does that change the need for a different setup?" Mr. Morgan responded the next day stating, "The TCLP tests are irrelevant. If there is a suspected hazard, you must follow protocol until you can prove there is not a hazard. Air monitoring is used to determine if there is no risk to the employees. TCLP is for waste stream determination." (R4, tab 221 at 2) Mr. Anderson (Gaskins) also recognized that worker protection was not determined from TCLP tests in a February of 2011 letter to Mr. Joyner (R4, tab 232).

65. Mr. Blum's report also noted that Gaskins and DACA recognized the requirement for exposure monitoring prior to the discovery of the elevated levels of chromium in the spent debris. Gaskins' Safety, Health & Accident Prevention Plan, dated 7 May 2009 and its Abrasive Blasting Plan acknowledged that "[a]ir sampling will be conducted during the initial phase of the project to determine the presence of toxic air contaminants commonly contained in industrial coatings to include RCRA Metals." (R4, tab 41(b) at GOV137, ¶ 1.3)

66. However, worker exposure monitoring was not conducted at the start of the project. On 18 November 2010 DACA's project Certified Industrial Hygienist (CIH) stated, "Air sampling for RCRA metals has not been completed by PIHS" (R4, tab 41(b) at GOV145, § 1.3). Mr. Blum's report indicates a 3 March 2011 email to DACA

22

regarding air sampling results appears to be the first record of worker exposure monitoring conducted on the site (*id.* at GOV10, -149).

67. Additionally, Mr. Blum's report directly contradicted Gaskins and DACA's assertions that the level of chromium required changes in PPE (R4, tab 41(b) at GOV10-12). His review disclosed Gaskins' Safety, Health & Accident Prevention Plan dated 7 May 2009, along with all subsequent submittals by DACA indicated the level of worker protection required and the level of respiratory protection for the abrasive blaster did not change, nor did the level of personal protective equipment (*id.* at GOV10).

68. Mr. Blum's conclusions related to worker protection are summarized as follows:

> OSHA and the USACE EM 385-1-1 require the contractor to conduct an assessment as to the hazards of the job and determine the level of PPE. I believe that the initial level of PPE as selected by both Gaskin and DACA, and maintained all the way through Mansfield Industrial, was adequate for the workers on this project. In fact, the level of worker protection used on this project is similar to most of my current projects involving lead or other recognized health hazards to the workers. What Gaskins and DACA failed to do in the way of worker protection was to conduct initial, appropriate air monitoring of their workers, provide proper training for its employees and conduct the appropriate medical testing.

(R4, tab 41(b) at GOV13)

69. Mr. Blum did not express an opinion regarding the need to hire more employees (and PPE) resulting from the alleged delay from 17 December through 24 January caused by the CO's directive that DACA submit another sampling plan to replace its previously-approved sampling plan and the inefficiency of using the DLA-provided roll-off containers.

*Containment*

70. DACA notified Gaskins by letter on 28 April 2011 that a change in containment would be required because of the presence of heavy metals, specifically, from a Class 2 to a Class 1 containment (R4, tab 304). Additionally, Mr. Hames testified the secondary containment was also required for transferring the waste from the

Envirovac vacuum boxes to the DLA-containers provided by the government for DACA use after the discovery of Hazardous Waste (tr. 2/164).

71. Mr. Blum's report explains that SSPC Guide 6 does not dictate the level of containment required but instead is an industry guide on how to construct a containment to meet criteria established by the owner (here, the government) (R4, tab 41(b) at GOV5). The contract, by Amendment No. 0002, § 09 93.37 ¶ 3.5.1 required the contractor to design a containment system to meet the requirements of SSPC Guide 6, Class 2 (R4, tab 3 at 479, ¶ 3.5.1). SSPC Guide 6, Class 2A and Class 1A containment both require negative pressure to be maintained throughout the use of the containment (R4, tab 41(b) at GOV6). Additionally Mr. Blum opined that, based upon his review of the Gaskins' and DACA's submitted plans, there was no intention of meeting the SSPC Guide 6 Class 2 containment requirements (*id.* at GOV7).

72. Mr. Blum did not address Mr. Hames' testimony regarding the requirement for a secondary containment for transferring the waste from the Envirovac vacuum boxes to the DLA-containers provided by the government for DACA use after the discovery of Hazardous Waste.

*Directed Use of DLA – Provided Containers*

73. The government directed Gaskins and DACA to use only DLA-provided containers for transferring the waste to the Mayport HWSF (R4, tab 197). The government then informed Gaskins that the Mayport HWSF was unable to provide DLA boxes or accept third-party vacuum boxes (R4, tab 254). As a result of the government's direction, DACA transferred the spent blast debris from the Envirovac vacuum boxes to HWSF supplied roll-off containers. Mr. Wright (DACA) testified that the on-site facility did not have containers readily available and, to avoid even further delays, DACA transferred the material to the available Envirovac boxes while it waited for available DLA containers. (Tr. 2/163-64) In April 2011, Ms. Mason was informed that the Mayport HWSF "will not deliver anymore roll-offs [containers] until the (2) on-site [containers] are turned in and it may take 15 days before they can replenish the roll-off." This resulted in limiting DACA to storing two DLA roll offs at the worksite at any given time and that the pickup and drop off services (provided by the government) could be delayed by up to 15 days. (R4, tab 281)

*DACA's Termination and Settlement Negotiations*

74. On 7 October 2010, DACA's attorney emailed Gaskins' attorney, Mr. Haire, copying Gaskins (Mr. Joiner and Mr. Ogletree) complaining that DACA's progress was being impeded by Gaskins' welding subcontractor who was performing work in the same area as DACA, stating, "DACA cannot absorb the cost of this interference" and "DACA will be financially ruined" if the situation is not corrected (R4, tab 145). The email also

24

stated that DACA had already spent $100,000 while only performing 1% of the work. DACA again complained to Gaskins on 8 October 2010 about the interference caused by the welding contractor (R4, tab 146). Gaskins responded that same day with a letter taking the position that DACA should have anticipated the actions of the welding subcontractor as part of the required scope of the job (R4, tab 147).

75. On 17 November 2010, Gaskins issued a cure notice to DACA, citing DACA's failure to maintain the schedule it submitted to Gaskins (R4, tabs 176). DACA responded on 19 November 2010 acknowledging the schedule slippage but blamed the delays upon defective welding work by Gaskins' welding subcontractor, Garrison Steel (R4, tab 178 at 16540). Subsequently, on 22 November 2010, Gaskins issued a second cure notice to DACA (R4, tab 182). DACA submitted a notice of claim letter to Gaskins on 7 December 2010 seeking compensation for and a time extension resulting from interference and delays caused by Gaskins' welding subcontractor, Garrison Steel (app. supp. R4, tab 27).

76. Gaskins notified the government on 2 February 2011 after heavy metals were discovered in the paint on the trusses in early February 2011 (R4, tab 24). Thereafter, DACA also submitted numerous claim letters to Gaskins seeking compensation for the heavy metals discovered on the trusses. By 7 March 2011 DACA had submitted three letters to Gaskins with estimates of the impact of the change pressing Gaskins to submit their claim to the government (app. supp. R4, tab 37). By April 2011, DACA informed its surety of the issues described above, and DACA's surety notified Gaskins on 28 April 2011 that it was prepared to revoke DACA's performance bond for a "cardinal change" (app. supp. R4, tab 53 at 486; tr. 1/91-92).

77. On 5 May 2011, the government notified Gaskins that it was concerned about Gaskins' ability to meet the current contract completion date and directed Gaskins to provide an explanation how it would meet its contract obligations (R4, tab 311 at 2). Gaskins responded on 16 May 2011 notifying the government that it was in talks with several potential subcontractors to supplement or replace DACA (R4, tab 315 at 2).

78. Internal government communications establish the CO and her team were aware of DACA's claims against Gaskins but not involved in the resolution of the dispute between Gaskins and DACA. Gaskins forwarded an email to the CO's attention with the subject "Change to work hours and meeting request" on 5 May 2011. (App. 2nd supp. R4, tab 249) The CO was puzzled why she was the recipient of this email and forwarded it to her team. Although the attachment is not in the record, the context of internal government email chain indicates part of the attachment related to the dispute between Gaskins and DACA. The information was passed up the management chain and Ms. Butler informed LCDR LeBeau that,

> We 'have' read and understood, this 1st surfaced (to us) at last week's QC mtg when DACA brought this up and was info'd he was to take this matter up directly with Prime (LCG), LCG is responsible to work this out with their sub, if they cannot reach agreement they need to get another contractor in to take over for DACA. The Government cannot directly solve the issue with DACA. Gov re enforced that at last week's Mtg. Sandra and I are conf calling Tim to find out their course of action.

(*Id.*) Later, on 18 May 2011, LCDR LeBeau informed the CO and her team that Mr. Anderson (Gaskins) told him of DACA's claims against Gaskins and there would be an upcoming meeting between Gaskins and DACA to resolve DACA's future on the contract (app. 2nd supp. R4, tab 250).

79. In May 2011, DACA's representatives, Gaskins' representatives, Gaskins' parent company's representatives, legal counsel for both DACA and Gaskins, and DACA's surety met to discuss potential solutions to address the situation (tr. 1/93; 3/104-05). On 19 May 2011, Gaskins and DACA agreed to terminate DACA's subcontract for convenience. Pursuant to the Termination Agreement, Gaskins agreed to compensate DACA for the reasonable and allowable costs (as judged by FAR and Defense Contract Audit Agency (DCAA) standards) of its actual performance and demobilization. (R4, tab 36 at 1171) Mr. Frost testified that Gaskins decided to terminate DACA:

> Because it became evident that, DACA's a small company, and with the additional cost and requirements that the job was piling up on, they could not, they couldn't, we felt they wouldn't be able to finish the job on time, certainly, and maybe not at all.
>
> We thought it was in the best interest of the project to terminate them for convenience, pay them their reasonable costs, as it says here, and then get somebody else to finish the work.

(Tr. 1/94)

80. Mr. Frost and Mr. Anderson spoke with Ms. Sandra Shelton, the CO, on 20 May 2011 and informed her that Gaskins had severed ties with DACA and DACA would begin demobilizing the next week. Ms. Shelton forwarded this information to Ms. Butler that same day. (R4, tab 317) DACA began demobilizing on 20 May 2011 and was completely demobilized from the work site by 31 May 2011, having completed

26

only approximately 15% of its scope of work at the time of the termination agreement (tr. 6/43-44; app. 2nd supp. R4, tab 311 at 2011).

81. On 1 June 2011, the government issued a cure notice to Gaskins stating that it considered Gaskins' removal of DACA to be a serious breach creating a work stoppage and delay (R4, tab 321 at 2). Gaskins responded by letter on 3 June 2011 informing the government that it would replace DACA with Mansfield Industrial (Mansfield) (R4, tab 326). Gaskins then contracted with Mansfield to complete the remainder of DACA's scope of the work. Mansfield began to mobilize on 22 June 2011 and began work by 28 June 2011 (app. 2nd supp. R4, tab 311 at 2148). Mansfield completed the work by 24 October 2011, three days ahead of its projected completion date of 27 October 2011 (R4, tab 39A at 17 of 22).

82. DACA provided Gaskins with its settlement proposal of its incurred costs for performing the work (tr. 1/95). Gaskins reviewed DACA's submittal, found the costs too high and told DACA to scrub their numbers and resubmit them. After DACA resubmitted its costs and Gaskins again rejected them, DACA served Gaskins with a demand for arbitration and filed for arbitration on 13 September 2011. (Tr. 1/95-97; R4, tab 334) Thereafter, Gaskins and DACA entered into arbitration over a 12-14 month period culminating in a settlement requiring Gaskins pay DACA a fixed amount and agreeing to submit the agreed fixed amount plus the remainder of DACA's claimed damages in a certified claim to the government (R4, tab 316).

83. On 9 November 2011, while still in settlement negotiations with DACA, Gaskins submitted a certified claim to the government requesting $6,225,235.82 and a time extension of 250.5 calendar days as a result of encountering hazardous materials in the coatings on the trusses, constituting a differing site condition (R4, tab 36 at 1112, 1118, 1124).

84. On 11 February 2013, Gaskins filed a notice of appeal and complaint (complaint) with the Board which was docketed as ASBCA No. 58550. The complaint asserted causes of action for differing site conditions, changes, and government caused delay requesting that the Board grant it an equitable adjustment in the amount of $8,911,078.86, plus interest, and a 361.5 calendar day extension to the contract.

*Gaskins' Delay Claims*

85. Gaskins' delay claim includes both excusable and compensatory delay incurred in performing work under CLINs 0002, 0003 and 0004 of the contract.[8] The

---

[8] The contract consisted of four CLINs (R4, tab 8 at 629). CLIN 0001's original completion date was extended by Mod. P00001 to 13 July 2009 (R4, tab 9 at 666). Work on CLINs 0002, 0003 and 0004 could not begin until work on CLIN 0001

12 March 2009 award letter established a completion date of 7 May 2010 (421 days) for CLINs 0002, 0003 and 0004 (R4, tab 7). However, there were eight modifications (P00002-P00009)[9] that ultimately extended the completion date for CLIN 0002, 0003 and 0004 to 19 September 2011, an additional 500 days. Gaskins achieved substantial completion on 21 October 2011 (R4, tab 344 at 2).

86. Gaskins asserts entitlement to a total schedule extension of 361.5 calendar days of excusable delay based upon the following six issues:

| Gaskins' Delay Claim | Days Requested |
|---|---|
| Replacement with Mansfield Industrial | 43 |
| Perry Roofing | 55 |
| Discovery of Hazardous Materials | 91.5 |
| Dispose of Spent Media at Mayport B Facility | 36.5 |
| Transfer Spent Media to DLA Dumpsters | 36.5 |
| Application of Intermediate Layer of Paint: Mod. P00003 | 99 |
| Total | 361.5 |

(Compl. ¶¶ 64, 88, 96, 100-14) Additionally, Gaskins asserts entitlement to compensation for 411.5 days of compensatory delay for additional labor, equipment, material, and other direct charges (361.5 based upon the issues above, as well as, an additional 50 days that were not compensated by Mod. P00009) (compl. ¶¶ 115-18).

*Evidence from Gaskins' Delay Expert*

87. Gaskins retained Trauner Consulting Services, Inc. (Trauner Consulting) to perform a review of Gaskins' delay claims, evaluate the time extensions granted in modifications 1 through 9 and the government's claim for liquidated damages assessed in Mod. 010 (app. 2nd supp. R4, tab 287 at 1518). Mr. J. Scott Lowe, of Trauner Consulting, authored an expert report (Lowe Report) and was accepted as Gaskins' expert in construction scheduling and delay analysis. Mr. Lowe rejected the use of Gaskins' project schedules finding they were not adequate to serve as a basis for quantifying critical project delays (tr. 4/16-17; app. 2nd supp. R4 tab 311 at 2008). Instead, he developed a project critical path from an as-built plot derived from the daily reports. Mr. Lowe's as-built plot begins on 5 January 2010 with the review of DACA submittals, not contract award, and progresses through thirteen critical path tasks until completion on 21 October 2011 (app. 2nd supp. R4, tab 311 at 2008). Mr. Lowe

_____

was completed (R4, tab 17 at 701). Since Gaskins completed the work on CLIN 0001 on time, Gaskin's claim does not include any delays associated with CLIN 0001 (app. 2nd supp. R4, tab 311 at 2010).

[9] All but two of the modifications were bilateral. Those two modifications are the only ones pertinent to Gaskins' delay claim – P00003 and P00009. (R4, tabs 11, 17)

explained during his testimony that he began his review 5 January 2010 because his focus was upon issues in dispute and there were not any issues in dispute until after 5 January 2010 (tr. 4/21-22). Mr. Lowe's analysis focused upon each of the issues asserted by Gaskins and concluded that Gaskins is entitled to 361.5 additional calendar days of excusable delay and 313 days of compensable delay (app. 2nd supp. R4, tab 311 at 2025, 2027).

*Evidence Submitted by the Government's Delay Expert*

88. The government retained Delta Consulting to evaluate Gaskins' schedule and any delays on the contract (R4, tab 39(a) at 1 of 22).[10] Mr. Charles Heckman, of Delta Consulting, authored a report and was accepted as the government's expert in construction scheduling and delay analysis. In contrast to Mr. Lowe's approach, Mr. Heckman employed an "As Planned vs. As Built Analysis" as the basis for his conclusions. The As Planned schedule was submitted by Gaskins and approved by the government (pre-dispute). (R4, tab 39(a) at 5 of 22) Mr. Heckman noted the plan provided for an early completion date of 4 March 2010, resulting in 64 calendar days of float on the planned critical path (*id.* at 4 of 22). The As Built data was derived from Gaskins' submitted schedule updates and spot checked for accuracy with information contained within Gaskins' daily reports. Mr. Heckman's approach, in contrast to Mr. Lowe's approach, was to progress through the As-Built schedule reconciling observed delays and applicable contract modifications (*id.* at 5 of 22). Mr. Heckman concluded the project was delayed 532 calendar days and that Gaskins was responsible for 232 calendar days of non-excusable delay over the course of the project. However, he also found that bilateral contract modifications, as well as Mansfield's successful performance, reduced Gaskins' delay responsibility from 232 calendar days to 32 calendar days. (*Id.* at 21 of 22)

*Discovery of Hazardous Materials and Replacement with Mansfield Industrial Delays*

89. Mr. Lowe did not express an opinion on the existence of a differing site condition but did analyze the impact such a condition would have had on the critical path (tr. 4/37). He likewise did not distinguish between the existence of a differing site condition and the replacement with Mansfield, combining the delay attributed to discovery of chromium in the paint on the trusses and DACA's replacement by Mansfield (tr. 4/39; app. 2nd supp. R4, tab 311 at 2010). He concluded that the discovery of elevated levels of chromium and the replacement of DACA with Mansfield Industrial resulted in a critical path delay of 74 calendar days. His opinion was based upon the fact that: Gaskins issued a notice of a differing site condition to the government on 2 February 2011; the daily reports documented that by 15 April 2011 Gaskins had

---

[10] The government's Rule 4 file designated Mr. Heckman's initial report as tab 39(a) and his supplemental report as tab 39(b).

stopped blasting and painting on the project; Gaskins terminated DACA for convenience on 19 May 2011 and replaced DACA with Mansfield; and, Mansfield did not begin work until 28 June 2011. (App. 2nd supp. R4, tab 311 at 2011-12)

90. In contrast, Mr. Heckman did not directly address the discovery of hazardous materials issue, assuming the government's position in his analysis. However, he did address the issue of Gaskins' replacement of DACA with Mansfield. His assessment was there was a 39 calendar day delay from DACA's termination till Mansfield began work which would be attributable to Gaskins. (R4, tab 39(a) at 16 of 22)

91. After the discovery of hazardous waste in the spent debris, on 17 December 2010 the CO directed DACA to stop work until a replacement sampling plan was developed and approved by the government (R4, tab 19). The CO's direction states, "It has also come to our attention that the required waste determination has not been properly performed. Per Part 2, Section 07 57 19.00 25, Paragraph 1.5 LABORATORY ANALYSIS." (*Id.* at 717) The revised plan was submitted on 19 January 2011 and approved with comments and direction to proceed on 24 January 2011 (app. 2nd supp. R4, tab 214).

*Perry Roofing Delays*

92. Gaskins complaint also alleges the discovery of hazardous materials delayed one of its subcontractors, Perry Roofing (Perry), work resulting in a 55-day delay in the project schedule (compl. ¶ 96). Mr. Lowe's conclusion from his review of the as-built plot was that the roofing work was not on the critical path but was concurrent with the blasting and painting activities at the trusses. With regard to the claimed delay related to work, he found that the work was started late and "the daily reports do not document substantial periods where rain impacted the progress of Perry's work." (App. 2nd supp. R4, tab 311 at 2012-13) Consequently, he did not allocate any excusable delay to this issue. Mr. Heckman did not address this issue in his report. We find Gaskins is not entitled to any excusable delay or compensable delay related to this issue.

*Disposal of Spent Media at Mayport HWSF and Transfer Spent Media to DLA Dumpsters Delays*

93. Mr. Lowe found that although the alleged change may have resulted in additional costs, "it does not appear that the critical path of work was delayed by the requirement to dispose of the hazardous waste at the Mayport B facility" (app. 2nd supp. R4, tab 311 at 2013). Likewise, Mr. Lowe found that, "it [transfer of the spent media to DLA Dumpsters] does not appear that the critical path of work was delayed by the requirement" (*id.* at 2014). Thus, he also did not find any excusable delay resulting from

30

this issue. Mr. Heckman did not address this issue in his report. We find Gaskins is not entitled to any excusable or compensatory delay related to this issue.

*Steel Profile Issue: Additional Layer of Intermediate Paint/Mod. P00003 Delays*

94. In March 2010, Gaskins discovered that the surface profile was deeper than anticipated in the specifications and the 2 to 3 millimeter required profile would not be attainable without a change to the contract (*see* finding 34). Mr. Lowe found that the daily reports confirm that Gaskins suspended its work pending direction from the government as to how to proceed. On 24 June 2010 the government approved a solution proposed by DACA for the coating issue and the associated cost but the government did not issue a Notice to Proceed until 3 August 2010 (app. 2nd supp. R4 tab 311 at 2014-15).

95. On 30 September 2010, the government executed Mod. P00003 for the additional layer of intermediate paint required to obtain the necessary profile, which provided a 159 calendar-day time extension to the contract (*see* finding 36).[11] Gaskins refused to sign the modification and on 14 February 2011 submitted a letter to the government stating its basis for entitlement to more time and describing how the additional 99 days of delay was calculated (app. 2nd supp. R4, tab 311 at 2015 (citing ex. 21 at 2179)).

96. Although Mod. P00003 recognized only 159 calendar days of delay, Mr. Lowe found Gaskins was actually due 214 calendar days. In his opinion, Gaskins was prevented from making progress on the critical path from 31 March 2010, when the condition was acknowledged by the government, to 3 August 2010, when the Notice to Proceed was issued, a period of 125 calendar days of delay. In addition, he reviewed the government's 31 May 2011 internal memo that confirmed the government agreed Gaskins was entitled to an additional 14 days for remobilization, and 7 days for containment repair. Since these 21 days represent a 21-day critical delay to the project and this delay was the result of the amount of time the government took to provide direction, Mr. Lowe opined Gaskins is entitled to a 21-day time extension for this delay. (App. 2nd supp. R4, tab 311 at 2016)

97. Gaskins stated that the additional work took 34 days that was not accounted for in Mod. P00003. On 17 June 2010, the government confirmed that Gaskins was due 34 days to complete the new work (R4, tab 120). Gaskins' proposal dated 20 June 2010, also included a 34-workday duration for the change work (app. 2nd supp. R4, tab 311

_____

[11] Gaskins complaint mistakenly states Mod. P00003 extended the schedule by 158 calendar days (compl. ¶ 107). It actually extended the schedule by 159 calendar days (R4, tab 11 at 677). Mr. Lowe mistakenly also used the 158 number in his analysis (app. 2nd supp. R4, tab 311 at 2015-18).

at 2192). This conclusion, was confirmed by an email dated 3 August 2010, where the government stated that the delay resulting from the additional work was 34 working days, and extended the contract completion date from 30 July 2010 to 20 September 2010, or a total of 52 calendar days (R4, tab 130). Because the work associated with providing an intermediate paint layer was critical, Mr. Lowe opined this entitled Gaskins to 52 calendar days (34 working days) of excusable delay (app. 2nd supp. R4, tab 311 at 2017).

98. In addition Mod. P00003 extended the schedule from 30 July 2010 to 5 January 2011. This period fell over the Mayport Christmas shutdown but the modification did not take this period into account. Regarding such a shutdown, the specifications stated, "No work shall be performed during the period **December 24, 2008 to January l, 2009 (9 days)**, inclusive, without prior written approval of the Contracting Officer." (R4, tab 1 at 54, § 01 14 00.05 20, ¶ 1.3.3 Exclusionary Period) Mr. Lowe's review of the daily reports documented that Gaskins worked on 17 December 2010, but did not return until 3 January 2011, incurring 16 calendar days of delay (18 December 2010 – 2 January 2011) (app. 2nd supp. R4, tab 311 at 2017). Although the specification holiday work exclusion period only references the 2008/2009 holiday period that was contemplated at award, we find that the intent of the contract was to exclude these dates from any applicable extensions to the contract performance period. Consequently Gaskins is entitled to 9 days of excusable delay for this issue.

99. Mr. Lowe concluded that the intermediate layer of paint issue resulted in a total critical path delay of 214 calendar days, as follows:

| | |
|---|---|
| Acknowledgment of differing site condition through NTP and the time required for [the government] to provide direction | 125 |
| DACA re-mobilization | 21 |
| Time to perform additional work in calendar days | 52 |
| Mayport Christmas shutdown | 16 |
| **Total** | **214** |

(App. 2nd supp. R4, tab 311 at 2018) Since Mod. P00003 granted an excusable delay of 158 days, Mr. Lowe found that Gaskins would be entitled to an additional 56 calendar day time extension (*id.*). Mr. Heckman merely accepted the 159 calendar day extension found in Mod. P00003 in his analysis (R4, tab 39(a) at 10 of 22). Based upon the one day mistake in Mr. Lowe's report of the number of days granted by the government in Mod. P00003 (158 versus 159) and our finding that Gaskins is only entitled to 9 calendar days for the holiday exclusion, we find Gaskins is entitled to 48 calendar days of excusable delay for this issue.

*Delay Associated with the Welding Rework Concurrent with the Steel Profile Issue*

100. Mr. Heckman submitted his initial report on 15 April 2015, finding the duration of the welding rework period to be 104 calendar days total of delay attributable to Gaskins/Garrison Steel but that a 70 calendar day portion of this period overlaps and is concurrent with the Steel Profile issue period – 29 June 2010 through 11 October 2010. Mr. Heckman later submitted a supplement to his report, revising his conclusions. (R4, tab 39(b)) After submitting his report, Mr. Heckman interviewed Mr. Champion, the welding inspector hired to inspect the defective welds. Mr. Heckman determined that Mr. Champion was regularly on the site from September 2010 through October 2011 and, as a result of Mr. Champion's interview, Mr. Heckman changed his opinion of the concurrency of the delay at the end of the project. He opined that the welding rework interfered with the progress of the on-going work (critical path) through the end of the project. As a result, his revised opinion is that the concurrent delay was 95 calendar days. (R4, tab 39(b) at 2-3 of 6)

101. Mr. Lowe did not address the welding delay in his report and testified it was not on the critical path (tr. 4/74-75). We find Mr. Heckman's conclusions more persuasive and find the welding delay was on the critical path and 95 calendar days of concurrent delay associated with the steel profile issue is attributable to Gaskins' welding subcontractor, Garrison Steel. Consequently, we find that Gaskins is entitled to 48 calendar days of excusable delay and no compensable delay.

*Compensable Delay under Mod. P00009 – Delay in Approval to Erect Multiple Containments*

102. Under the contract, Gaskins was restricted to erecting only two containment systems on the project. On 9 April 2010, Gaskins submitted a request to erect four (two additional) containment systems on the project and, having received no response, Gaskins followed-up with a second request on 8 September 2010 (app. 2nd supp. R4, tab 311 at 2279-81). The government requested additional information which was provided on 14 September 2010. The contract required that the government respond to such a request within 21 days, 5 October 2010 (14 September – 5 October 2010) (R4, tab 1 at 78, § 01 00. 05 20, ¶ 1.4.2.1). The government did not respond until 24 November 2010, 50 calendar days later than required by the contract (5 October 2010 – 24 November 2010). The government responded to Gaskins' request on 16 November 2011 granting its request for additional containments and agreed Gaskins was entitled to a 50 calendar day time extension for the delay but denied Gaskins was entitled to any compensation for the delay (app. 2nd supp. R4, tab 311 at 2283).

103. The government executed Mod. P00009 on 14 October 2012, granting a 50 calendar day extension to the contract for the delay associated with the approval of

multiple containments (R4, tab 17).[12] Gaskins executed Mod. P00009 on 28 September 2012 but reserved its rights to "to pursue time extensions and monetary damages" (*id.* at 701, 704). Mr. Lowe concluded Gaskins was entitled to a compensable delay of 25 days (half the total delay) because he found that the work impacted by this delay was critical and that granting Gaskins' request would have doubled its productivity (app. 2nd supp. R4, tab 311 at 2024). Mr. Heckman did not analyze this issue but adopted the time allotted in Mod. P00009 of 50 calendar days (R4, tab 39(a) at 14).

104. Mr. Lowe concluded that Gaskins is entitled to an additional 130 calendar days of excusable delay and 313 days of compensable delay (app. 2nd supp. R4, tab 311 at 2025-27).

Government Affirmative Claims

*Government Assessment of Liquidated Damages: ASBCA No. 59902*

105. The government issued Mod. P00010 (Mod. 10) on 5 September 2014, assessing, $92,000.00 in liquidated damages, stating:

> As of modification P00009, the contract completion date is 19 September 2011. Acceptance was taken 21 October 2011. 32 days of liquidated damages are being assessed as follows.
>
> CLIN 0002 32 days at a liquidated damages rate of $2,000.00 per calendar day = $64,000.00
> CLINs 0003/0004 32 days at a liquidated damages rate of $875[.]00 per calendar day = $28,000.00
>    Total liquidated damages being assessed - $92,000.00

(R4, tab 344) A COFD was issued on 8 December 2014 asserting a claim for $94,000.00[13] in LDs and retained the assessed amount from Gaskins' final payment (R4, tab 346; tr. 8/123-24).

---

[12] Mod. P00009 also provided an additional 17 day time extension to correct an oversight in Mod. P00001. However, this delay is not in dispute in this appeal.

[13] The amount of $94,000.00 assessed by the COFD appears to be a clerical error (R4, tab 346 at 1). Mod. 10 only assessed $92,000.00 (a copy of which is attached to the COFD) (*id.* at 5). Additionally, a LD calculation chart attached to the COFD also reflects the $92,000.00 assessment, despite the fact it mistakenly recognizes 34 rather than 32 days of delay (*id.* at 10).

34

106. The same COFD that assessed LDs on 8 December 2014 also assessed costs in the amount of $80,268.31 resulting from defective welding and deficient quality control. This sum was comprised of the cost of the welding inspection services ($7,115.00) and a portion of the cost incurred by the government under the follow-on contract for hangar 1552 (phase II) attributable to the defective welds, deficient quality control and the required re-work under the contract ($73,153.31). The damages relating to the suspension of Phase II was based on a "pro rata" share of the damages the government paid out for suspending Phase II, which the government found was proportionately the responsibility of Gaskins. The calculation of this amount was based upon the premise that Phase II of the project was suspended for a period of 437 days at a cost of $925,000.00 paid out under a subsequent contract, of which 32 days was attributable to Gaskins. (R4, tab 346)

107. Gaskins appealed the 8 December 2014 COFD to the Board on 27 March 2015.[14] The government claim for defective welding was docketed as ASBCA No. 59901 and the claim for LDs was docketed as ASBCA No. 59902.

## DECISION

### Fraud in the Inducement

The government asserts three fraud-related affirmative defenses: (a) fraud related to the representation in Gaskins' proposal that spent blast debris would be disposed through the on-site facility; (b) fraud related to DACA's lack of QS-1 certification at the time of award; and (c) fraud related to Gaskins' alleged concealment of defective welds approved by Gaskins' welding inspector. Gaskins addresses all three defenses in its brief (app. reply br. at 28). However, it appears the government has abandoned its defense in the case of the certification issue and the defective welding claim because it does not address these issues in its post-hearing briefs. Therefore, we consider these two defenses to have been waived. Since a ruling for the government in the fraud or misrepresentation in the inducement defense related to the waste disposal issue would render the contract void *ab initio*, thus barring appellant's claims in their entirety, it is a threshold issue that we will address before addressing the merits of the claims in these appeals.

The common law defense of fraud in the inducement may be established by proof of fraud or material misrepresentation. RESTATEMENT (SECOND) OF CONTRACTS § 164(1) (1981). However, unlike the Court of Federal Claims, the Board does not have

---

[14] Due to a mistake the COFD was not mailed until 18 December 2014 and received by Gaskins on 29 December 2014.

jurisdiction to impose civil or criminal penalties and forfeitures for a fraudulent claim. *Supreme Foodservice GmbH*, ASBCA No. 57884 *et al.*, 16-1 BCA ¶ 36,387 at 177,400 n.17 (citing *United Technologies Corp.*, ASBCA No. 46880 *et al.*, 95-2 BCA ¶ 27,698 at 138,079 n.1.) The only time the Board may base its determination regarding this defense upon fraud grounds is when a court of competent jurisdiction has determined that a fraud occurred. *Supreme Foodservice*, 16-1 BCA ¶ 36,387 at 177,384 n.17; *Environmental Systems, Inc.*, ASBCA No. 53283, 03-1 BCA ¶ 32,167 at 159,053 (on recon.) (citing *Martin J. Simko Construction, Inc. v. United States*, 852 F.2d 540, 547-48 (Fed. Cir. 1988)). In instances where there has not been fraud found by a court, we may make findings as to the material facts relating to misrepresentation and the contract and how the acquisition regulations, statutes and contract clauses operate given those findings. *Supreme Foodservice*, 16-1 BCA ¶ 36,387 at 177,384; *Servicios y Obras Isetan S.L.*, ASBCA No. 57584, 13 BCA ¶ 35,279 at 173,162 (citing *United States v. Acme Process Equipment Co.*, 385 U.S. 1381 (1966)); *Toombs & Co.*, ASBCA Nos. 35085, 35086, 89-3 BCA ¶ 21,993. It is well established that when one party to a contract induces the other party to enter into an agreement through fraud or misrepresentation, the contact is void *ab initio*. *J.E.T.S., Inc. v. United States*, 838 F.2d 1196, 1200 (Fed. Cir 1988), *cert. denied*, 486 U.S. 1057 (1988); *Supreme Foodservice*, 16-1 BCA ¶ 36,387 at 177,384. The Restatement defines a misrepresentation as, "an assertion that is not in accord with the facts." RESTATEMENT (SECOND) OF CONTRACTS § 159 (1981).

*Disposal Through the On-Site Waste Disposal Facility*

The government argues the facts establish Gaskins made a false statement by stating in its proposal that it would dispose of the paint blast debris at Mayport's HWSF, as required by the RFP, but the government alleges that Gaskins had no intention of doing so (gov't br. at 68-72; gov't reply br. at 10-15). The solicitation stated in two places that the waste resulting from the blasting was regulated waste and would be disposed through the Mayport HWSF (finding 16). Gaskins 15 January 2009 proposal clearly stated that the waste generated would be treated by Gaskins as regulated waste and disposed of through the Mayport HWSF. All three source selection board members testified they evaluated Gaskins proposal and relied upon Gaskins statement that all blast debris would be disposed of through the Mayport HWSF in recommending Gaskins for award. (Finding 19) However, three years later, after the blast debris tested hazardous and the CO required the disposal on-site through the Mayport HWSF, Gaskins took the position that the solicitation allowed DACA to dispose of the blast media off-site and that the change from the as planned disposal off-site to the Mayport HWSF was a change to the contract that resulted in higher disposal costs (findings 53-55, 57). Thus, the government's argument relies solely upon the language in Gaskins' proposal and Gaskins' actions years later when hazardous waste was discovered (gov't br. at 68-72).

In response, Gaskins asserts there was no fraud or misrepresentation in the inducement related to waste disposal. Gaskins argues there was no misrepresentation

36

because inclusion of the statement in its proposal was inadvertent and did not reflect the RFP requirements as changed by solicitation Amendment No. 0002. (App. reply br. at 29) Perhaps, in hindsight, Gaskins believes inclusion of this language was a mistake but we are not persuaded it was inadvertent. There is no evidence to support that conclusion. Gaskins points to the testimony of Mr. Frost who testified it was his understanding that it was the result of a "cut and paste" error by the architect – engineering firm (A&E) firm hired by Gaskins (finding 21).[15] We put little credence in Mr. Frost's testimony on this issue since he did not prepare the proposal but merely reviewed it. Conspicuously, Gaskins did not call the designer of record or anyone from the architect firm to testify about the alleged mistake. Likewise, Gaskins did not present testimony from Mr. Beasley, the estimator who prepared the bid, or Mr. Gaskins who signed the proposal on behalf of the company (findings 20-21). Additionally, as the government points out (gov't reply br. at 11), this language was inserted in Gaskins' initial proposal and remained there through amended proposals that were submitted after Amendment No. 0002 but it did not raise this issue during discussions or otherwise question the statement in the solicitation (finding 21).

We conclude Gaskins has failed to establish the language in the proposal was inadvertent and the logical conclusion from that fact is that Gaskins' intent at the time of proposal submittal was exactly what a plain reading of the language indicates, that all disposal would be on-site through the Mayport HWSF. The record supports the conclusion that the intent of Gaskins' proposal was that all regulated waste would be disposed of on-site through the Mayport HWSF but that DACA's intent was that it would be disposed of off-site; that there was a lack of communication between the prime and its sub in preparing the proposal. Mr. Frost testified that Gaskins' proposal relied upon its subcontractor's methodology and there is no evidence DACA ever communicated its intent to dispose of waste off-base to Gaskins during the source selection. In fact, Mr. Mingle (DACA) testified he does not remember ever communicating the proposed method of disposal to Gaskins. This is supported by the record, which only indicates DACA submitted pricing information to Gaskins (finding 21).

Based on these findings, we conclude that the government has not proven that Gaskins' proposal contained a misrepresentation. When a contractor makes a promise of future performance in a proposal and later fails to perform, this generally will be a basis for liability for breach of contract but not for misrepresentation. To also prove misrepresentation, the government must prove a misrepresentation at the time of proposal, such as that the contractor did not intend to perform or knew it could not perform. RESTATEMENT (SECOND) OF CONTRACTS § 159 cmt. c, d (1981). The

---

[15] Gaskins argues that the government attempts in its brief to introduce deposition testimony to impeach Mr. Frost's testimony during the hearing after close of the record and his deposition testimony is not admissible evidence in rendering our decision (app. br. at 29). We sustain Gaskins' objection.

government has not done so in this appeal and has, therefore, not proven its fraud in the inducement defense.

Finally, the government focuses solely upon two assertions in Gaskins' proposal stating that spent blast debris would be disposed of on-site but ignores other parts of Gaskins' proposal that required off-site disposal. Our findings establish the solicitation's disposal specifications were so ambiguous on this point that we conclude they cannot support a finding of fraud in the inducement (*see* findings 15-17).

For all the reasons stated, we conclude Gaskins' representations on this issue do not constitute fraud in the inducement.

## DECISION ON THE MERITS

GASKINS' CLAIMS:  ASBCA No. 58550

*Differing Site Condition:  Discovery of Hazardous TCLP Results in Spent Blast Debris*

Gaskins alleges the presence of hazardous material in the existing paint constitutes a Type I Differing Site Condition because the specifications stated the existing paint was non-hazardous and the existence of the hazardous materials could not be discovered through reasonable diligence prior to bidding. As a result, the differing site condition caused appellant and its subcontractors to incur damages and negatively impacted the contract schedule. (App. br. at 40)

In order to prevail on a claim for a Type I differing site condition, the contractor must prove by a preponderance of the evidence that:

> [T]he conditions indicated in the contract differ materially
> from those actually encountered during performance; the
> conditions actually encountered were reasonably
> unforeseeable based on all information available to the
> contractor at the time of bidding; the contractor reasonably
> relied upon its interpretation of the contract and
> contract-related documents; and the contractor was damaged
> as a result of the material variation between expected and
> encountered conditions.

*Comtrol, Inc. v. United States*, 294 F.3d 1357, 1362 (Fed. Cir. 2002) (citing *H B. Mac. Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998)). The "indication" in the contract "need not be explicit or specific" if it "provide[s] sufficient grounds to justify a bidder's expectation of latent conditions materially different from those actually encountered." *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916

38

(Fed. Cir. 1984) (citation omitted). Determining what the contract indicated requires contract interpretation performed by stepping into "the shoes of a reasonable and prudent contractor and decid[ing] how such a contractor would act in interpreting the contract documents." *Randa/Madison Joint Venture III* v. *Dahlberg,* 239 F.3d 1264, 1274 (Fed. Cir. 2001) (quotations and citation omitted).

Gaskins contends the solicitation clearly defined the existing paint on the trusses and the resulting abrasive debris as regulated, non-hazardous waste and the specifications defined regulated waste as a type of solid waste that specifically precludes hazardous waste (app. br. at 42). Furthermore, attachment B.2 of the solicitation informed the offerors that the paint did not exceed TCLP levels for metal and that it was not hazardous waste but directed offerors to treat the waste as regulated waste (*id.*). Gaskins also contends that it interpreted the solicitation to define the waste as non-hazardous and that the government agreed there was no hazardous waste/materials when it failed to respond to appellant's request for information (RFI) during the source selection and the waste was only determined to be hazardous during performance (*id.* at 42-52).

The government counters contending there was no differing site condition because the RFP disclosed the presence of hazardous materials in the paint because the total metal test results disclosed in the RFP identified the presence of chromium and lead in the existing coatings which should have alerted any reasonable industrial painting contractor to the need to employ appropriate worker protection measures (gov't reply br. at 4-10).[16]

We agree with Gaskins that the discovery of hazardous levels of chromium in the spent blast debris differed materially from the conditions disclosed in the RFP. Our findings indicate the solicitation communicated to the offerors that any metals in the paint did not exceed hazardous levels and the waste debris would not be hazardous but would be treated as regulated waste. Attachment B.2 of the solicitation provided the offerors with the testing results that indicated the existence of lead, chromium and other metals in the paint and instructed the offerors that the paint did not exceed TCLP hazardous levels so was not hazardous waste but was still regulated waste. (Finding 7) Amendment No. 0001 to the solicitation, in response to an offeror's question during a pre-proposal site visit, stated that the paint was not lead based but the waste would be regulated waste (finding 8). The solicitation defined regulated waste to specifically exclude hazardous waste. Specification Section 01 57 19.00 25, ¶ 1.2.11, defined Regulated Waste as a type of solid waste and defined solid waste as "[g]arbage, refuse, debris, sludge, or other discharged material (except hazardous waste as defined in paragraph entitled 'Hazardous

---

[16] The government makes a distinction between hazardous materials and hazardous waste i.e. content of paint before blasted and waste debris stream after blasting (gov't reply br. at 4-10). Although the parties may have used the terms incorrectly and interchangeably in their pleadings and during this appeal, we conclude it does not impact our decision.

Waste' or hazardous debris as defined in paragraph entitled 'Hazardous Debris'" (finding 16).

Amendment No. 0002 to the solicitation added a requirement that the contractor be SSPC QP 2 certified, which pertains to a contractor's proficiency in hazardous paint removal. Appellant submitted an RFI to the CO requesting clarification on the need for such a certification since the test results indicated there are no hazardous materials present and the blasting material will be treated as regulated material. (Finding 9) Although this question did not directly address chromium, it clearly communicated to the government that appellant interpreted the RFP to indicate that the test reports indicated there were no materials in the paint measuring above hazardous levels and the waste would be regulated but not hazardous. This allowed the government an opportunity to correct appellant's reading to conform to the interpretation the government now takes. Although appellant's question was examined by the government, appellant's question was never answered. (Findings 10-13) Consequently, the government is bound by this interpretation. *See, e.g., Schuster Eng'g, Inc.,* ASBCA No. 28760 *et al.,* 87-3 BCA ¶ 20,105; *Edgemont Constr. Co.,* ASBCA No. 16759, 73-2 BCA ¶ 10,234; *Triple "A" South,* ASBCA No. 27736, 86-2 BCA ¶ 18,968 (also finding that where a contractor attempts to clarify a solicitation ambiguity before submitting its bid, and the government did not respond, the government is bound by the contractor's interpretation of the ambiguity).

Likewise, we conclude that neither Gaskins nor DACA could reasonably foresee that the existing paint and resulting abrasive debris would be classified as hazardous waste prior to execution of the contract and that they reasonably relied on the solicitation documents and possessed a reasonable interpretation of the solicitation documents in this regard.

Although Gaskins has proved four of the five elements required to establish the existence of a differing site condition, it must additionally prove it was damaged as a result of the material variation between expected and encountered conditions to be entitled to an equitable adjustment as a result of a differing site condition. *Comtrol,* 294 F.3d at 1362. Gaskins asserts five discrete damages resulting from this differing site condition: (1) additional costs of complying with the government's on-site disposal directive (app. br. at 55-61); (2) additional costs of disposing of contaminated PPE (*id.* at 61); (3) additional costs and time transferring waste from previously approved vacuum boxes to DLA approved containers (*id.* at 62-63); (4) additional costs and time erecting a second containment (*id.* at 62); and (5) time to develop a replacement plan (*id.* at 64). We address each in turn.

40

*Disposal of Spent Blast Debris On-Site*

DACA disposed of the first two containers of spent debris, which tested non-hazardous, off-site (findings 48-50). Upon the discovery of hazardous waste in the following batch of spent debris, the CO directed appellant to dispose all spent debris on-site at the Mayport HWSF (finding 53). Gaskins contends this action was a change to the contract because it bid this project on DACA's expectation it would only be required to dispose of non-hazardous waste and that waste would be disposed of off-site (app. br. at 55-61). In response, the government contends Gaskins' disposal claim fails outright because it is contrary to the plain language of the contract (which includes Gaskins' proposal), and Gaskins has not proved pre-bid reliance on its *post hoc* interpretation of the RFP as allowing disposal at an offsite landfill (gov't br. at 73-78).

It is undisputed that Gaskins' proposal mirrored the RFP language that stated, "all particles, blast grit and debris be treated as regulated waste and containerized for disposal through the Naval Station Mayport hazardous waste storage facility" (finding 19). Despite its representations in in its proposal, Gaskins now argues the contract did not require disposal of regulated non-hazardous waste on-site. Assuming arguendo Gaskins' interpretation is correct, it would still contractually be required to dispose of all spent blast debris on-site. This source selection was a best value negotiated procurement pursuant to FAR part 15 that allows an offeror to propose performance that exceeds the requirements of the solicitation, which Gaskins' contends it did (finding 3). Since Gaskins' proposal was incorporated into the contract upon award, Gaskins was required to dispose of the spent blast debris, whether hazardous or non-hazardous, on-site (finding 22).

There was some testimony to the effect the language in Gaskins' proposal was a mistake (finding 20). However, we have already rejected this argument in our decision related to the government's arguments for fraud or misrepresentation in the inducement, concluding there is no credible evidence of a mistake in the sense that it was inadvertent.

Furthermore, the contract contains an Order of Precedence clause for design-build contracts identified as specification provision 5252.236-9312 (finding 4). This clause provides that any portion of the proposal that exceeds the requirements of the solicitation has precedence. *Macro-Z-Technology*, ASBCA No. 56711, 13 BCA ¶ 35,225 at 172,833. Assuming arguendo Gaskins' position is correct, that the solicitation permitted non-hazardous waste to be disposed of off-site, this clause would require Gaskins to dispose of non-hazardous waste on-site because it proposed to dispose of all hazardous waste on-site.

Additionally, a review of the contract quickly discloses several contradictory requirements pertaining to disposal of regulated waste. The provisions in Part 2 are internally inconsistent (findings 15-16), Part 3 mandates on-site disposal (finding 17) and

41

Part 5 (Amendment No. 0002) directs off-site disposal (finding 18). Per the provisions of the Order of Precedence clause Part 3 would take precedence since Part 2 is internally inconsistent. Consequently, we conclude Gaskins (DACA) was required to dispose of all spent blast debris on-site, whether hazardous or non-hazardous.

Even if Gaskins' had not proposed off-site disposal and there was not an order of precedence clause in the contract, the result would be the same. We conclude the solicitation was patently ambiguous imposing a duty upon Gaskins to inquire. Having not done so, the ambiguity must be resolved against Gaskins. *Triax Pac., Inc. v. West*, 130 F.3d 1469, 1475 (Fed. Cir. 1997); *Phoenix Management, Inc.*, ASBCA No. 57234, 11-1 BCA ¶ 34,734 at 171,005.

Additionally, Gaskins contends the government never relied upon this language in its proposal because the government approved plans that specifically stated that the spent blast debris would be disposed of off-site, agreed with DACA's interpretation in a meeting, and by email the CO ratified environmental personnel and technical personnel's statements that the contract allowed off-site disposal (app. br. at 56-58).

Our findings establish that Gaskins (DACA) first submittal of a Surface Preparation and Coating Plan was rejected because it did not address the disposal issue. The CO's comments, dated 17 December 2009, stated disposal would be on-site. Gaskins then revised the plan to direct on-site disposal. (Finding 24) However, later that month, DACA began taking the position the contact allowed disposal off-site. Gaskins now contends the government approved of off-site disposal in late January 2010 (app. br. at 57). This is a reference to a meeting between DACA and government environmental personnel during which DACA advocated for its interpretation that off-site disposal was authorized under the contract and later represented that the government approved off-site disposal during that meeting. Our findings establish there is no credible evidence to support Gaskins argument; contrary to DACA's representations regarding the meeting, the government personnel testified they told DACA that the contract required on-site disposal and the CO testified she did not remember ever attending or hearing of such a meeting and did not approve off-site disposal. (Findings 25-27)

Clearly the government approved plans submitted by DACA per the contract that allowed DACA to proceed with the work. Additionally, it is clear from the record that DACA repeatedly submitted plans that indicated disposal off-site. However, our findings establish that it is impossible to establish from the record what specific draft submittals were approved, what, if any, comments were associated with those approvals, and what specific provisions were included in the plans approved. Additionally, a review of those plans fails to correlate approval with specific plans. Those comments that are in the record indicate the government required on-site disposal. (Finding 33)

42

Gaskins also contends the government is bound by the CO's ratification of environmental and technical personnel's email communication to the contractor that the contract allowed off-site disposal. On 20 October 2010, in response to a set of questions, Ms. Kaiser (Mayport hazardous waste program manager) stated in an email to other government personnel and Mr. Moody (Gaskins) that she was "good with [Chesser] Island Road Landfill" for disposal off-site. Then Ms. Mason (CO's engineering technician) forwarded this email to the "Team" that included government personnel and Mr. Moody, copying the CO, Ms. Bushey (Hocutt), stating that solicitation Amendment No. 0002 specifically allowed off-site disposal, a copy of which she attached to the email. Ms. Bushey took no action in response to the email. (Findings 49-51)

Gaskins contends that the CO ratified the contract interpretation expressed by the government personnel in the email string when she did not respond or take some action (app. br. at 57-58). We have already concluded that the contract required on-site disposal. Ms. Mason did not have authority to change the terms of the contract (finding 51). Ms. Bushey's (Hocutt) testimony confirms she did not take any action in response to the email, i.e. she remained silent. Silence in and of itself is not sufficient to establish ratification. There must also be a showing of actual or constructive knowledge of the action being ratified. *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1433-34 (Fed. Cir. 1998), *cert denied*, 525 U.S. 1177 (1999). We have held implied ratification to occur in situations similar to those presented here where the CO remains silent while in the presence of unauthorized government personnel making incorrect representations to the contractor that the contractor reasonably relies upon. *Brown Constr. Co.*, ASBCA No. 22648, 79-1 BCA ¶ 13,745 at 67,368 (Government personnel at pre-bid conference made incorrect representations regarding the contract requirements. Although the CO, was present, heard the statements and knew they were incorrect, the CO took no action to correct them.); *Lox Equipment Co.*, ASBCA No. 8985, 1964 BCA ¶ 4463 at 21,472 (inspector issued improper directives causing the contractor to perform work in excess of the contract requirements were ratified by the CO when he received knowledge of the inspectors directives and how they were being interpreted but failed to take effective action to correct the situation).

Here, the CO's testimony established that she read the email, understood Ms. Kaiser and Ms. Mason's interpretation of the contract that off-site disposal was allowed and disagreed with their interpretation. She also was aware the email was sent to Gaskins personnel. (Finding 51) Although being copied on the email alone would not be enough, given these facts, we conclude the CO ratified the actions of the government personnel and their interpretation on this issue, constructively changing the contract to allow off-site disposal prospectively. The discovery of hazardous waste in the spent debris was shortly after the constructive change requiring the hazardous waste to be disposed of on-site. Since disposal on-site was more expensive than off-site, Gaskins would normally be entitled to an equitable adjustment for the difference in costs. However, that is not the case here. Gaskins proposed disposing of all waste on-site

43

(finding 19) presumably pricing these costs into its proposal. Consequently, Gaskins is not entitled to such an equitable adjustment for disposal of the hazardous debris on-site after the ratification occurred because it constitutes a windfall to Gaskins.

Regarding the prior off-site disposals, the CO could not have ratified the disposal of the containers already taken off-site because she did not have knowledge of them at the time of her ratification. DACA's subcontractor disposed of the waste off-site on 18 October 2010 but the government (CO) was not notified of the disposals until 22/23 October 2010 (finding 48).[17]

Gaskins also asserts entitlement to 36.5 days of excusable and compensatory delay associated with this issue (finding 86). Since we have concluded Gaskins was contractually required to dispose of all spent blast debris on-site at award, Gaskins bears responsibility for any delays related to this issue and is not entitled to any excusable or compensatory delay for this issue.

*Additional Costs of Disposal of Contaminated/PPE and Additional Costs and Time Transferring Waste from the Previously Approved Vacuum Boxes to DLA-Approved Containers.*

Our findings establish that upon discovering the spent debris contained hazardous waste the government directed Gaskins (DACA) to dispose of the spent debris through the Mayport HWSF using only DLA-provided containers, but that shortly thereafter, also informed Gaskins (DACA) that the Mayport HWSF was unable to provide DLA-provided vacuum boxes or accept third-party vacuum boxes (finding 73). Gaskins contends this action introduced delays and unanticipated inefficiencies requiring DACA to transfer debris from the vacuum boxes to DLA-approved open-top containers involving DACA personnel handling the abrasive debris twice – once to vacuum it and once to transfer it – costing DACA additional labor hours, costs to pay those laborers, costs for outfitting additional laborers with PPE, and costs for disposing of that PPE as a hazardous waste (app. br. at 62-63). We conclude that the order to use DLA-provided containers was not a change to the contract and Gaskins is not entitled to any costs related to the conversion from a third-party vacuum box to the DLA approved boxes, including the transfer from the third-party containers to DLA containers. Gaskins was required to dispose of all waste through the Mayport HWSF from the time of award. All offerors were warned in

---

[17] Under proper procedures, the government would have signed the documentation allowing the contractor to dispose of the waste off-site and, thus, would have known of the action when it occurred. However, in this case the contractor improperly signed as generator and approval for disposal on the documentation and disposed of the waste without informing the government. (Finding 48)

44

attachment B.2 of the solicitation that they needed to establish an account to order DLA approved containers in advance through the facility (finding 7).

Regarding the PPE related damages, Gaskins concedes that the discovery of elevated chromium levels in the paint did not change the PPE used by DACA's original workforce through the conclusion of DACA's involvement on the project. Consequently, Gaskins does not claim damages for the PPE used by DACA's original nine workers. Instead, Gaskins claims (a) the costs of disposing of the PPE as a hazardous waste and purchasing replacement PPE for the original nine workers and (b) the costs for outfitting additional workers (beyond the original nine workers included in DACA's bid) with PPE (app. reply br. at 12)

Mr. Blum's opinion substantiates Gaskin's position that the level of worker protection did not change as a result of the discovery of elevated levels of chromium in the spent debris (findings 66-68). However he did not opine on the need to hire more employees that would necessarily have required PPE (finding 69). It is unclear from the record whether the additional workers were also required to work on the jobsite (blasting) as well as transferring debris for temporary storage waiting on DLA containers from the government. We conclude that Gaskins has met its burden of proof related to the original nine workers. Gaskins has also met its burden of proof regarding the additional workers for costs incurred in transferring the debris to/from temporary containers because of the government's delay in providing DLA containers.

Gaskins also asserts 36.5 days of excusable and compensatory delay for transfer of spent media to DLA containers (finding 86). Gaskins' delay expert opined that any such delays were not on the critical path. As a result, our findings establish no entitlement to any excusable delay or compensable delay for this issue (finding 93).

*Additional Costs and Time Erecting a Second Containment*

Gaskins contends that DACA was required to erect a second containment for workers to remove their contaminated PPE and to transfer hazardous waste from the previously approved, Envirovac vacuum boxes into DLA- provided containers (app. br. at 62). We fail to find any evidence in the record supporting Gaskins' assertion that a second containment for workers to remove their contaminated PPE was a change to the contract. We are persuaded by Mr. Blum's opinion that the containment requirements found in the contract did not change as a result of the discovery of elevated levels of chromium in the spent debris. As to the transfer issue, Mr. Blum did not address the need for a secondary containment to transfer hazardous waste from the Envirovac vacuum boxes. Gaskins presented testimony that the second containment was required to transfer the debris to the vacuum containers for temporary storage in response to the government's delay in providing DLA containers (finding 70). As we have already stated, Gaskins is not entitled to any costs related to the conversion from a third-party

45

vacuum box to the DLA approved boxes *per se*, but is entitled to costs incurred with transferring spent debris for temporary storage because of the government's delays in providing DLA containers. Consequently, we conclude Gaskins is also entitled to costs for a second containment to facilitate these transfers.

Gaskins does not specifically break out a claim for delay associated with the contaminated issue. Our findings establish this alleged delay was not on the critical path. As a result, there is no entitlement to any excusable delay or compensable delay on this issue.

*Time to Develop a Replacement Sampling Plan*

After the discovery of hazardous waste in the spent debris, on 17 December 2010 the CO directed Gaskins to stop work until a replacement sampling plan was developed and approved by the government (finding 53). The revised sampling plan was approved with comments and direction to proceed on 24 January 2011 (finding 56). Gaskins contends there was an approved plan already in place that the government considered valid but the CO provided no explanation why a new one was required. This, Gaskins contends, resulted in a delay of performance from 17 December 2010 to 24 January 2011, constituting a 38 calendar days of excusable delay and a direct consequence of the differing site condition (discovery of hazardous waste) (app. br. at 64). The government did not address this issue in its briefs.

We conclude Gaskins is not entitled to any delay resulting from the CO's direction. The underlying premise of Gaskins' argument, that there is no explanation for the CO's direction, is incorrect although a bit terse. The CO did provide an explanation stating, "It has come to our attention that the required waste determination has not been properly performed. Per Part 2, Section 07 57 19.00 25, Paragraph 1.5 LABORATORY ANALYSIS." (Finding 53) Based upon the circumstances involved, we conclude the CO's actions were reasonable. Gaskins is not entitled to any excusable or compensable delay for this issue.

*Steel Profile Issue: Additional Compensation Mod. P00003*

The government concedes this issue constituted a differing site condition but argues Gaskins was fully compensated by execution of Mod. P00003. In contrast, Gaskins' appeal appears to seek both direct damages for additional costs not reimbursed for additional work and damages for delay to the schedule that are not reimbursed in Mod. P00003 (compl. ¶ 53; app. br. at 65-67). As to the direct damages, the record establishes Gaskins was reimbursed less in Mod. P00003 than the amount submitted in its change proposal (finding 36). We conclude Gaskins is entitled to the proven reasonable

46

incurred cost of additional work that was not included in the amount reimbursed by Mod. P00003.

Gaskins also asserts 99 days of excusable and compensatory delay as a result of this issue (app. br. at 65-67). Our findings establish Gaskins is entitled to 48 days of excusable delay resulting from this differing site condition and no compensable delay (finding 101).

*DACA Termination, Arbitration Expenses and Replacement with Mansfield Industries*

Gaskins contends it is entitled to recover its incurred costs in arbitrating and settling DACA's claims that were directly and proximately caused by the government's failure to recognize and pay for clearly changed work requirements (app. br. at 68-73). Specifically, Gaskins contends the combined effect of the Mod. P00003 shortfall and lack of any compensation for the discovery of hazardous waste resulted in DACA never being able to perform as it bid and left DACA financially devastated (*id.* at 68). Gaskins contends the specific damages it and DACA incurred resulted from: "(a) arbitrating and settling the dispute proximately caused by the government's failure to pay; (2) legal fees and consultant cost to review DACA's submissions, prepare for, and participate in the arbitration; and (3) subcontracting the remainder of DACA's work to Mansfield, for an additional cost" (*id.* at 69).

We are not persuaded that DACA's financial condition was the direct and proximate result of the government's failure to pay the claimed Mod. P00003 shortfall. Our findings establish that after the discovery that the existing profile of the trusses was deeper than indicated in the specifications, the CO suspended work on 31 March 2010. DACA remained mobilized and the parties eventually agreed to solve the issue by an additional layer of paint. Gaskins submitted a proposal of $508,979, assuming a re-start date of 5 July 2010. However, notice to proceed was not issued until 3 August 2010 and the modification was not issued until 30 September 2010. Mod. P00003 increased the contract price by $466,988.36, approximately 92% of the Gaskins' proposal. (Findings 34-37)

Only seven days after issuance of Mod. P00003, DACA's attorney emailed Gaskins' attorney, copying DACA (Mr. Joiner and Mr. Ogletree), complaining that DACA's progress was being impeded by Gaskins' welding subcontractor, Garrison Steel, who was working in the same area as DACA. This contemporaneous email indicates that DACA was in a difficult financial position at the time of the surface profile issue and execution of Mod. P00003 but that DACA considered the cause to be the interference by Gaskins' welding subcontractor, not the government. There is conspicuously no mention of the surface profile issue, a shortfall associated with Mod. P00003 or government responsibility for its financial plight. (Finding 74) Thereafter, on 17 November 2010, Gaskins issued a cure notice to DACA for failure to maintain schedule. DACA's response on 19 November 2010, acknowledged the schedule slippage but again blamed

47

the delay on the defective welding work by Gaskins' welding subcontractor not the government. This was followed by a second cure notice to which DACA responded with a claim letter seeking compensation and a time extension for the interference caused by Gaskins' subcontractor. (Finding 75) The record is devoid of any contemporaneous evidence that DACA's financial plight was the result of the surface profile differing site condition. Rather, the evidence indicates DACA's financial plight at this period of time was the result of Gaskins' welding subcontractor.

We are also not persuaded that DACA's financial plight was the direct and proximate result of the failure of the government to pay Gaskins' claims resulting from the discovery of hazardous levels of heavy metals in spent blast debris. A large financial component of Gaskins' claim is based upon asserted changes requiring DACA to dispose of all spent blast debris on-site, add more staff and occupational exposure protection methods for hazardous materials, including medical surveillance, respirators, HEPA filters, protective clothing, shower and eyewash stations, and other precautions. In addition to the above, Gaskins' asserts the discovery of hazardous materials in the existing coatings required DACA to revise the containment system from a "Class II" to an air-sealed "Class I" containment. We have already addressed these alleged consequences and concluded the discovery of hazardous material in the spent blast debris did not entitle Gaskins to an equitable adjustment for the requirement to dispose of all blast debris on-site, require DACA to revise the containment system from a "Class II" to a "Class I" system, or change the worker protection/PPE requirements. Although Gaskins has proven entitlement to some damages as a result of the discovery of hazardous materials in the spent blast debris, we are not persuaded they constitute the direct and proximate cause of DACA's financial plight.

Gaskins' asserts the government is solely responsible for DACA's financial plight which resulted in DACA's termination, Gaskins' incurrence of arbitration expenses and the replacement with Mansfield. Although the two differing site conditions may have contributed to DACA's financial plight, we are not persuaded they were the sole, or even paramount, cause of DACA's financial plight. Rather, our review of the evidence related to this issue causes us to conclude that the direct and proximate cause of DACA's termination, the incurrence of arbitration expenses and replacement with Mansfield was not the result of the differing site conditions but rather a combination of interference from one of Gaskins' other subcontractors, Garrison Steel, and DACA's determination to dispose of spent debris off-site, contrary to Gaskins' proposal, which in turn was caused by the failure of communication between DACA and Gaskins during the source selection. Consequently, we conclude Gaskins has failed to meet its burden of proof on this issue and is not entitled to these damages.

Gaskins also notes that the government was aware of its actions to terminate DACA and hire Mansfield and references an internal government email exchange in support of its assertion the government approved of this action (app. br. at 68-69). Our

findings establish the government did have knowledge of Gaskins' actions and internally agreed Gaskins should replace DACA if it could not bring DACA back on schedule. However, there is no evidence anyone in the government ever communicated this opinion to Gaskins or ordered Gaskins to terminate DACA. (Finding 78)

Gaskins seeks 43 days of excusable and compensatory delay for replacing DACA with Mansfield (finding 86). Given Gaskins' failure to meet its burden of proof on this issue, there is no entitlement to either excusable or compensatory delay.

*Delay Associated with Discovery of Hazardous Waste in Spent Debris*

Gaskins seeks 91.5 days of excusable and compensatory delay associated with the discovery of hazardous waste in the spent debris (compl. ¶¶ 100-01). Gaskins' delay expert combined this alleged delay with the replacement of Mansfield opining there were 74 days of delay associated with both issues, assuming that this issue directly resulted in DACA's termination and replacement with Mansfield (findings 89-90). This analysis is contrary to Gaskins' complaint that asserts two separate claims, i.e. 91.5 days delay for this issue and 43 days delay for replacement of Mansfield (compl. ¶¶ 100-01, 109-10). Mr. Lowe's analysis is based upon the date Gaskins gave notice of the differing site condition, the date DACA stopped work and the date Mansfield began work; his opinion turns upon the assumption the government was the sole cause of DACA's termination. We have already concluded the discovery of hazardous waste was not the sole cause of DACA's termination and replacement with Mansfield. Consequently, we conclude Gaskins has failed to meet its burden of proof on this issue.

*Perry Roofing*

Gaskins, in its complaint, alleges the discovery of hazardous materials resulted in project delays and, as a result, Perry was unable to commit to vendors within the ordering window resulting in increased material costs and forced Perry to work in the rainy season requiring Perry to work on smaller portions of the roof at a time (compl. ¶¶ 93-95). Gaskins' brief alleges an additional cause of delay and disruption resulting from the government's delay in issuing Mod. P00003 (app. br. at 67). Mr. Erdman, Perry roofing's senior field superintendent, testified that government-caused delays pushed their work out beyond their originally planned work period resulting in great administrative costs and cost increases in prices for 80% of its materials. Mr. Erdman's testimony was contradicted by Ms. Mason's testimony. Ms. Mason testified she was on site during this period and that Perry Roofing requested and was allowed to store approximately 80% of its roofing materials on-site. Additionally, she testified Perry Roofing invoiced the government and was paid for these materials in February 2011. The price increases referenced by Mr. Erdman were not effective until 1 March 2001. (Finding 38) We find Ms. Mason's testimony more credible on this issue and conclude

49

Gaskins has failed to meet its burden of proof and, consequently, is not entitled to any compensation for the alleged delays or disruption to Perry Roofing's performance.

Gaskins also seeks 55 days of excusable and compensatory delay resulting from this issue (finding 86). Mr. Lowe, Gaskins' delay expert, did not allocate any excusable or compensable delay for this issue based upon his review of the daily reports (finding 92). Our findings indicate this work was not on the critical path but concurrent with the blasting and painting work and, therefore, is not entitled to any excusable or compensatory delay (*id.*).

*Multiple Containment Request: Mod. P00009*

Gaskins was granted a 50 calendar day excusable delay by Mod. P00009 for government delays to process its request to erect two additional containments on the hangar worksite. This modification was bilateral but Gaskins reserved its right to seek additional time and compensation. (Findings 102-03) Gaskins seeks 50 additional days of compensable delay (compl. ¶¶ 116-17). Based upon Gaskins' delay expert's conclusions, our findings establish Gaskins' is entitled to a compensatory delay of 25 days (finding 103).

*Summary of Gaskins' Delay Claim*

Below is a summary of our conclusions on Gaskins' delay claim:

| Compensable Delay | Claimed | Granted |
|---|---|---|
| Replacement with Mansfield Industrial | 43 | 0 |
| Discovery of Hazardous Materials | 91.5 | 0 |
| Perry Roofing | 55 | 0 |
| Dispose of Spent Media at Mayport B Facility | 36.5 | 0 |
| Transfer Spent Media to DLA Dumpsters | 36.5 | 0 |
| Application of Intermediate Layer of Paint (P00003) | 99 | 0 |
| MOD P00009 Delay in Approval for Request to Erect Multiple Containments. | 50 | 25 |
| Total | 411.5 | 25 |

50

| Excusable Delay Issues | Claimed | Granted |
|---|---|---|
| Replacement with Mansfield Industrial | 43 | 0 |
| Discovery of Hazardous Materials | 91.5 | 0 |
| Perry Roofing | 55 | 0 |
| Dispose of Spent Media at Mayport B Facility | 36.5 | 0 |
| Transfer Spent Media to DLA Dumpsters | 36.5 | 0 |
| Application of Intermediate Layer of Paint (P00003) | 99 | 48 |
| Replacement Sampling Plan | 38 | 0 |
| Total | 399.5 | 48 |

*Government's Affirmative Claims: Government Assessment for Defective Welding and Deficient Quality Control (ASBCA No. 59901) and Assessment of Liquidated Damages (ASBCA No. 59902)*

The government assessed liquidated damages based upon 32 days of delay (finding 105). The government is not entitled to these damages because we determined Gaskins is entitled to 48 days of excusable delay. The government also assessed costs resulting from defective welding and deficient quality control. This assessment included a discrete cost for the weld inspection services and a portion of the cost incurred by the government under the follow on contract for hangar 1552 (phase II) attributable to the defective welds, deficient quality control and the required re-work under the contract. (Finding 106) The government is entitled to recover the costs of the required inspection and any damages incurred on the Phase II contract attributable to delay caused by Gaskins. However, the damages relating to the suspension of Phase II was based on a "pro rata" share of the damages the government paid out for suspending Phase II, which the government found was proportionately the responsibility of Gaskins. This calculation was based upon the premise that Gaskins delayed the schedule by 32 days. (*Id.*) Our findings establish Gaskins is entitled to 48 days of excusable delay, rather than responsible for 32 days of delay (finding 104). Consequently, we conclude the government has failed to meet its burden of proof regarding the damages related to the Phase II delays but is entitled to the costs of the inspection.

## CONCLUSION

Gaskins' appeal in ASBCA No. 58550 is sustained in part and denied in part for the reasons stated. The appeal in the government's claim in ASBCA No. 59901 is sustained in part and denied in part for the reasons stated. The appeal in the

51

government's claim in ASBCA No. 59902 is denied for the reasons stated. ASBCA Nos. 58550 and 59901 are returned to the parties for a negotiation of quantum.

Dated: 9 June 2017

JOHN J. THRASHER
Administrative Judge
Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

MICHAEL N. O'CONNELL
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 58550, 59901, 59902, Appeals of L.C. Gaskins Construction Co., Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals